**APEX CONTROL SYSTEMS, INC.,**
Appellant and Cross–Appellee,

v.

**ALASKA MECHANICAL, INC.,**
Appellee and Cross–Appellant.

Nos. S–2636, S–2658.

Supreme Court of Alaska.

June 2, 1989.

Arthur L. Robson, Robson Law Office, Fairbanks, for appellant and cross-appellee.

Jacob H. Allmaras, Artus, Choquette, Williams & Allmaras, Anchorage, for appellee and cross-appellant.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

OPINION

COMPTON, Justice.

Alaska Mechanical, Inc. ("AMI") is a mechanical contractor engaged in the business of furnishing and installing plumbing, heating and air conditioning systems. Apex Control Systems, Inc. ("Apex"), a mechanical controls contractor, designs, furnishes and installs the devices which regulate heating and air conditioning systems. It is customary for mechanical contractors to subcontract the controls work to controls contractors.

This case arises from two unrelated subcontracts between AMI and Apex: the Adak contract and the Pump Station No. 3 contract.

During the performance of the Adak contract, the parties disagreed as to whether Apex was required under the contract to furnish and install certain controls. Later, following performance of the Pump Station No. 3 contract, a dispute arose as to whether Apex was entitled to additional compensation under that contract for certain contract "extras."

The disputes were tried together. In written findings of fact and conclusions of law, Judge James A. Hanson held for AMI in the Adak contract dispute and for Apex in the Pump Station No. 3 contract dispute. He designated AMI as the prevailing party and awarded it attorney's fees and costs.

Apex appeals the judgment on the Adak contract dispute, including the designation of AMI as the prevailing party in the overall litigation. AMI appeals the judgment on the Pump Station No. 3 dispute.

The specific facts pertaining to each contract dispute are set out separately in this opinion.

## I. THE ADAK CONTRACT

### a. *Facts and Proceedings.*

In April 1981, the Department of the Navy issued a bid invitation for a project at the Adak Naval Station. The project involved replacement of the plumbing for the chilled water cooling system and replacement of the plumbing for the heating system. In the months following the bid invitation, AMI prepared a bid for the mechanical work on the project. AMI obtained bids from a number of controls contractors for the controls work that would be required under the contract. The bids for the controls work all fell between $105,000 and $119,000.

Apex's bid of $108,000 specifically excluded "humidifyer [sic] packages and refrigeration controls," but included "control air for refrigeration controls." None of the other bids contained similar exclusions.

AMI was awarded the mechanical subcontract and it awarded the controls subsubcontract to Apex. The fixed-price contract between Apex and AMI includes the following description of the work to be performed by Apex:

ARTICLE II—WORK TO BE PERFORMED

The Subcontractor [Apex] agrees to furnish all materials, labor, tools, equipment, supervision, supplies, transportation, and other things, unless otherwise provided herein, necessary or required to perform, and to perform fully and completely, at the price or prices set forth herein, and all that portion of the work required to be done by the Prime Contractor under the General Contract, as described as follows:

All heating, ventilating and air-conditioning controls as necessary for a complete and operable system as shown and described in contract drawings and specifications as issued under IFB–N62474–80–B–9657 including amendments #0001 through #0004 and inparticular [sic] Section 15904.

Immediately below the description of the work to be performed, a handwritten paragraph provides:

Chiller and refrigeration controls are excluded from this subcontract, however control air will be provided.

The work required of AMI and its subcontractors by the general contract included furnishing and installing chilled water system sequencing controls. A chilled water system provides chilled water to the coils of an air conditioning system. The

water is chilled by devices known as "chillers". In this contract, the specifications called for four chillers. The specifications also called for a control mechanism to turn the chillers on and off in sequence with changes in the water temperature. For example, the controls were to activate chiller number 3 when the water temperature rose above 52°, and to turn it off when the temperature dipped below 48°; the controls were to activate chiller number 2 at 54°, and turn it off at 50°.

During the performance of the contract, a disagreement arose between AMI and Apex as to whether Apex was required under its subcontract to provide the sequencing controls. AMI instructed Apex to proceed with the work on the understanding that financial responsibility for the work would be determined at a later date. Sequencing controls were provided by Apex with the help of another subcontractor. Defects in the system designed by Apex could not be corrected, and ultimately new sequencing controls were designed and installed by third parties.

The trial court concluded that AMI was entitled to back charge Apex for the costs incurred to design and install the chilled water system controls. It held that Apex was not entitled to payment for design services and materials furnished with reference to the chilled water system controls.

b. *The trial court did not err in finding that the handwritten clause excluding "chiller controls" was not intended by the parties to exclude chilled water system controls.*

In its written findings of fact, the trial court stated:

There exists a distinction between "chiller controls" and "chilled water system controls" which is recognized within the construction industry. The contract between AMI and Apex for the Adak Project required Apex to design, furnish and install the "chilled water system con-

trols." That requirement was not excluded by the oral and/or written bid submitted by Apex to AMI or by agreement of the parties.

Apex contends that the contract did not require it to provide the chilled water system controls and that the trial court erred in finding such a requirement in the contract.

Because the task of interpreting the contract required the trial court to weigh extrinsic evidence, the trial court's conclusion should be accorded the deference this court accords to findings of fact. *Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 771 n. 2 (Alaska 1982). This court will not set aside the trial court's findings of fact unless those findings are clearly erroneous, that is, unless this court is left with a definite and firm conviction on the whole record that a mistake has been made. *Martens v. Metzgar*, 591 P.2d 541 (Alaska 1979).

There seems to be little question that but for the handwritten exclusion, the subcontract would have required Apex to provide the chilled water system controls. The subcontract requires Apex to perform work described as "All heating, ventilating and air-conditioning controls."[1]

The primary dispute is over the meaning of the handwritten clause excluding the "chiller controls" from the work to be performed. As Apex points out, the project specifications in one place refer to the sequencing controls for the chilled water system as "chiller control." Apex contends that the court should look no further than the project plans in interpreting the term "chiller controls"; it contends that the handwritten exclusion was clearly intended to exclude the sequencing controls from the work to be performed by Apex.

AMI contends that the trial court should rely on extrinsic evidence of the parties' intentions. A witness called by AMI testified that the engineer's use of the term "chiller controls" in the contract specifica-

---

**1.** At trial, Fred Hollaus, president of Apex, testified that he had intended to bid only on the work described in section 15904 of the specifications. He testified that the chilled water system controls were described in other sections of the specifications, but he was unable after long effort to identify those sections.

tions was a misuse. He and others testified that the term "chiller controls" refers to factory installed controls internal to the chiller unit itself. AMI contends that the handwritten exclusion of chiller controls and refrigeration controls was intended to exclude only certain factory-installed controls normally provided by other parties; Apex was to provide the chilled water system sequencing controls.

Ample testimony supports the proposition that an industry-recognized distinction exists between "chiller controls" and "chilled water system controls." The trial court concluded that Apex was required under the contract to design, furnish and install the chilled water system controls. We are not convinced on the whole record that the trial court was mistaken in reaching this conclusion.

## II. THE PUMP STATION NO. 3 CONTRACT

### a. Facts and Proceedings.

The subcontract between AMI and Apex on the Pump Station Three project provided in part:

> The Subcontractor agrees to make no claims for extras unless the same shall be fully agreed upon in writing by the Contractor prior to the performance of any such extra work, and this condition shall not be waived in any manner by the Contractor, or amended, unless in writing.

During the course of the Pump Station No. 3 project, Apex submitted a number of extra work invoices. AMI's on-site piping foreman, John Eberly, signed invoices apparently authorizing additional compensation for work performed by Apex. A dispute later arose between the parties as to whether Apex was entitled to payment of these invoices.

The trial court concluded that the "contract extras were approved by authorized employees of AMI." It ordered AMI to pay the amounts set out in the extra-work invoices.

### b. The trial court did not err in concluding that Apex was entitled to additional compensation for certain work performed on the Pump Station No. 3 project.

AMI contends that the work described in the invoices was included in the work required under the fixed-price contract.[2] If AMI is correct, the work might fall outside the contract provision for "extra work."[3]

AMI also contends that Eberly did not have power to authorize extra compensation under the contract.[4]

The question whether the invoices constitute approved extras under the contract is one of contract interpretation. The court below considered the question in the light of extrinsic evidence; the task of weighing that evidence is for the trier of fact. O'Kelley, 645 P.2d at 771 n. 2. This court will not set aside the trial court's findings of fact unless those findings are clearly erroneous, that is, unless we are left with a definite and firm conviction on the whole record that a mistake has been made. Martin v. Metzgar, 591 P.2d 541 (Alaska 1979).

2. The trial court made no finding of fact on this issue.

3. AMI argues that because the work was required under the fixed-price contract, no consideration existed for AMI's purported promise to pay additional compensation. AMI is correct in its statement of the law. See Chicago College of Osteopathic Medicine v. George A. Fuller, Inc., 776 F.2d 198, 208 (7th Cir.1985) ("agreement to do what one is contractually obligated to do is not valid consideration"). But AMI's argument is misguided.

The contract between the parties speaks to the circumstances under which extras are to be payable. In order for Apex to prevail, it is not necessary that the invoices constitute valid contract modifications, only that they fall within the meaning of the contract provision permitting extra compensation. See id. Hence the question here is one of contract interpretation, not of a contract formation.

4. Again, the contract speaks, however inadequately, to the question of what constitutes approval of a contract extra. Thus, the question whether Eberly's signature constitutes approval by AMI is governed not by the law of agency, but by the parties' reasonable expectations as embodied in the contract.

■ The trial court's finding that Eberly's signature constituted "approval" under the contract was not clearly erroneous. That Eberly purported to "approve" the invoices supports the conclusion. That Eberly was AMI's on-site piping foreman at a remote site (Pump Station No. 3) further supports the conclusion. Though Roger Sires, president of AMI, testified that Eberly lacked authority to amend contracts, he did not testify that Eberly lacked the authority to approve contract "extras."

The remaining issue is whether the trial court erred in implicitly concluding that this finding was dispositive: should the court also have considered whether the work described in the "extra-work" invoices was included in the work already required under the fixed-price contract?

Two interpretations of the approval provision seem plausible.

First, the parties may have intended the approval provision to set up a "procedure for resolving ... disputes," as Apex contends. On such a reading, approval by AMI would operate to resolve finally the question whether additional compensation was to be paid.

Second, the parties may have intended invoice approval to be a necessary prerequisite to submitting a claim for additional compensation, but not as a final determination as to its validity. This is implicit in AMI's argument. On such a reading, AMI would not be foreclosed from denying a claim approved on site if it later determined that the claim was not submitted in good faith to cover *extra work* necessarily performed.

The parties' practice of permitting the foreman to approve extra-work invoices on site is by no means patently inconsistent with an intention to treat approval as a means of finally resolving disputes over what work falls within the contract. It is undisputed that Eberly was AMI's piping foreman at a remote job site. Although it appears that Eberly had limited knowledge of the contract specifications, he could have checked with his superiors off site prior to approving the invoices. Further, Apex president Fred Hollaus testified that he discussed the work to be performed with AMI's head office over the telephone before submitting some of the invoices.

■ We are not convinced that the court erred in concluding that approval on the site by Eberly foreclosed the question whether Apex was entitled to additional compensation for the work described in its "extra work" invoices. Therefore, we affirm the decision of the trial court.

III. THE COURT DID NOT ERR IN DESIGNATING AMI AS THE PREVAILING PARTY.

Apex contends that the trial court erred in designating AMI as the prevailing party for purposes of awarding attorney's fees.

Apex prevailed at trial on the Pump Station No. 3 contract dispute and in addition was awarded $1020 in subsistence charges due on the Adak contract. AMI conceded prior to trial its liability for sums due on a third, unrelated contract. Though AMI prevailed in the Adak contract dispute, the balance due Apex on the contract exceeded AMI's offset for expenses incurred in installing the chilled water system controls. Thus, Apex obtained an affirmative recovery.

Apex contends that because it prevailed on most of the issues and because it obtained an affirmative recovery, the trial court should not have designated AMI as the prevailing party.

■ Designation of the "prevailing" party is committed to the broad discretion of the trial court. *Adoption of V.M.C.*, 528 P.2d 788, 795 (Alaska 1974). The trial court will be held to have abused this discretion only when its designation is manifestly unreasonable. *Id.*

■ A litigant may be the prevailing party if successful with regard to the main issue, even if the other party receives some affirmative recovery. *Alaska Placer Co. v. Lee*, 553 P.2d 54, 63 (Alaska 1976).

■ The principal amount at issue with respect to the Pump Station No. 3 contract was approximately $2,100. The principal amount at issue with respect to the Adak

contract was approximately $20,500. Most of the testimony at trial concerned the Adak contract dispute. The Adak contract dispute was clearly the main issue at trial.

Because AMI prevailed on the main issue at trial, the trial court did not abuse its discretion in designating AMI as the prevailing party.

### CONCLUSION

The decision of the superior court is AFFIRMED.