**ESTATE OF E. Donald ARBOW; Paul S. Buxton; Carolyn Buxton; Ronald Petersen; Ronald Feigin; W. Marshall Dotson, Jr.; Glenda Dodson, Appellants,**

v.

**ALLIANCE BANK, successor by merger to United Bank of Alaska, Appellee.**

No. S–2960.

Supreme Court of Alaska.

April 20, 1990.

---

J.L. McCarrey, III, William G. Stewart, McCarrey & McCarrey, Inc., Anchorage, for appellants.

David H. Bundy, Jo A. Kuchle, Mike Lahau, Guess & Rudd, A.M. Zahare, Bradbury, Bliss & Riordan, Anchorage, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

This case arises from a default in the repayment of a $700,000 loan made by Alliance Bank [formerly United Bank of Alaska (UBA)] to shareholders of Alaska Laser Knights, Inc. (ALK). The superior court granted summary judgment in favor of UBA, holding the shareholders jointly and severally liable for the loan in accordance with their individual guarantees. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

In early 1984 promoter Michael Carrigan solicited investors for a nightclub to be called Spenardo da Vinci's, which was to be owned by ALK.

Carrigan, then ALK's president, solicited the participation of UBA vice-president Hal Sellick. After becoming an investor, Sellick allegedly expedited a loan from UBA for ALK's nightclub. Sellick eventually became the president and a director of ALK. In seeking the loan for ALK, Carrigan offered to secure UBA through investor guarantees.

In early February 1984, pursuant to Carrigan's offer, UBA issued a commitment letter agreeing to loan $550,000 to ALK on the condition that all investors guarantee the loan. The letter contained a disclaimer:

"Please note that this letter is not a loan agreement, and does not address all covenants governing the credit."

A week later UBA's loan committee convened and decided as an internal policy matter not to accept a guaranty from Hal and Marilyn Sellick.[1] UBA informed Carrigan of the loan committee's decision. Allegedly Carrigan in turn told Hal Sellick of the loan committee's decision. The committee did not, however, notify any other investors or lower-level UBA employees of the decision. As a result, UBA's lower-level employees continued to treat the Sellicks as guarantors.

On February 19, 1984, all the investors, including the Sellicks, signed a shareholder agreement, providing in part:

As a condition of financing, shareholders have been asked to and have agreed to personally guaranty the Company's debt to $600,000 and may be asked to and agree to personally guarantee the Company's debt in the future.

The agreement also specified the liability of any shareholder who failed to provide his or her percentage contribution towards any debt as follows:

3. *Failure to Meet the Demand.* The obligation to meet any demand in accordance with this agreement shall be specifically enforceable at law or in equity by the Company. Should any shareholder fail to make any payment required by this agreement, the deficiency shall be made up by the remaining shareholders in accordance with the schedule set forth in Paragraph 1, who shall be entitled to reimbursement from the defaulting shareholder.

On the same day each investor, allegedly including the Sellicks,[2] signed a separate personal guaranty for the entire amount of the loan. Both Carrigan and Hal Sellick

---

1. The loan committee was concerned that possible ethical and insider trading problems with the Securities and Exchange Commission (SEC) might render such a guaranty inadvisable. Additional reporting requirements to the SEC would also be imposed on UBA as a result of an internal loan.

2. No individual guarantees from the Sellicks were ever found. The Sellicks could not recall if they had executed any or not.

emphasized the necessity of obtaining guarantees from every investor. Many of the investors claimed they would not have guaranteed the loan had they known Hal Sellick would not. Hal Sellick held himself out to the other investors as the facilitator of the loan, even though he couldn't be the loan officer formally, and suggested that he had the "inside scoop" on UBA. The investors never requested to speak to a loan officer at UBA. Instead, they relied on information provided by Carrigan and Hal Sellick.

The nightclub opened and operated as a going concern, but soon encountered difficulty. In an attempt to salvage the club, UBA made an additional loan of $155,000 to ALK upon the same terms as the initial loan.

In January 1986 the two loans were amortized and consolidated.[3] UBA notified investors that the loan was in default. In March 1987 UBA filed suit against the investors, all now shareholders, for $612,-000 plus interest, costs and attorney fees. It moved for summary judgment. The shareholders opposed and cross-moved for summary judgment. The trial court granted summary judgment in favor of UBA. The shareholders' motion to reconsider was denied. The trial court made no findings of fact or conclusions of law. Following entry of final judgment, the shareholders appeal.

## II. DISCUSSION

### A. STANDARD OF REVIEW.

On appeal from summary judgment, we draw all reasonable inferences in favor of the non-moving party, in this case the shareholders. *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1284 (Alaska 1985). If the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, show no genuine issues of material fact and that UBA is entitled to judgment as a matter of law,

the trial court will render judgment in its favor. Alaska R.Civ.P. 56(c).

Here no material fact is in dispute. The trial court had at its disposal and presumably based its decision on all records proffered, examining the evidence in the light most favorable to the shareholders.

■ Where a trial court fails to specify the basis for summary judgment, there is a presumption that it ruled in the movant's favor on all grounds stated. *State v. Appleton & Cox of California, Inc.,* 703 P.2d 413, 414 (Alaska 1985). Therefore, the summary judgment will be reversed only if none of the grounds advanced supports the trial court's decision. *Id.*

### B. THE TRIAL COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT.

The shareholders argue that obtaining guarantees from all of them, including the Sellicks, was a condition precedent to enforceability of the guarantees. UBA argues that there was no such condition precedent.

■ The law is clear that conditional guarantees are unenforceable absent the occurrence of the condition. *E.g., Carrier Brokers, Inc. v. Spanish Trail,* 751 P.2d 258, 261 (Utah App.1988).

■ Here, assuming *arguendo* that such a condition existed, it has been fulfilled. The shareholder agreement is in and of itself a contractual guaranty binding all shareholders. The Sellicks agreed therein to personally guaranty the company debt, regardless of whether they executed separate guarantees. The shareholder agreement provides for a percentage contribution in the event of the failure of the company to make payments, establishes a procedure for demanding payment to cure default and sets the obligation of the shareholder who fails to meet the demand.

The position of the shareholders would be no different had UBA been able to find separate guarantees signed by the Sellicks. The shareholder agreement obligates a

---

**3.** Upon consolidation of the two loans, UBA personnel attempted to find the Sellicks' individual guarantees in the initial loan package. They could not find the Sellicks' individual guaran-

tees among the others and discovered high-level officers had decided against accepting their guarantees.

shareholder to pay off any loan to the bank and seek proportional reimbursement from the other shareholders. Restatement of Security § 149 (1941) ("A surety who in the performance of his own obligation discharges more than his proportionate share of the principal's duty is entitled to contribution from a cosurety.") [4]

AFFIRMED.[5]

RABINOWITZ, Justice, dissenting.

I cannot agree that the shareholder agreement upon which the court relies created obligations equivalent to the Sellicks' rejected guarantees. In my view, neither the recital nor the demand clause quoted by the court create such obligations.[1]

*The Demand Provisions.*

The shareholder agreement at issue provided a mechanism to "cure or prevent any [ALK] default, deficiency or delinquency" by requiring individual shareholders to contribute in proportion to their investment shares. This demand procedure, however, could be initiated only by ALK's board of

---

4. *State Bank of East Moline v. Cirivello,* 74 Ill.2d 426, 24 Ill.Dec. 839, 386 N.E.2d 43 (1978) is distinguishable. In *East Moline,* the problem was that the insider guarantor did not execute the guaranty or anything equivalent, resulting in the other co-guarantors claiming that his guaranty was a pre-condition to theirs. Here, however, all the co-guarantors executed the shareholders' agreement, which we deem to bind all of them personally on the loan.

5. Because the Sellicks did execute a guaranty, the shareholders' allegations of unilateral mistake, misrepresentation, and statute of frauds violation are without merit.

1. The shareholder agreement provides:

SHAREHOLDER AGREEMENT

This Shareholder Agreement entered into this 19th day of February, 1984 by and among Rayburn L. Hinchey and Peggy Hinchey; William M. Dotson, Jr; E. Donald Arbow; Mitchell H. Pike; Harold L. Sellick and Marilyn Sellick; Ronald W. Petersen; Paul S. Buxton and Carolyn Buxton; Teras Yurashak; Van N. Carrigan; Nancy Cole; Glenda Dodson; Ronald Feigin; and Michael and Lauri Carrigan, shareholders of Alaska Laser Knights, Inc.

RECITALS

1. Shareholders are shareholders of Alaska Laser Knights, Inc. (hereinafter the "Company").

2. The Company has applied for and obtained certain financing through United Bank Alaska and may apply for and obtain additional financing in the future, in an amount not to exceed $2,150,000 in the aggregate.

3. As a condition of financing, the shareholders have been asked to and have agreed to personally guarantee the Company's debt to $600,000 and may be asked to and agree to personally guarantee the Company's debt in the future.

4. The shareholders desire to enter into this agreement to specify their respective obligations among themselves in the event the company defaults on its financing or is otherwise unable to make periodic payments on its financial obligations.

NOW, THEREFORE, the shareholders agree as follows:

1. *Percentage Contribution.* Should the Company, for any reason, be unable to make payments or default on financial obligations guaranteed by the Company, then, at the election of the Company's Board of Directors, the shareholders shall cure or prevent any such default, deficiency or delinquency in accordance with the following percentages:

Rayburn L. Hinchey and Peggy Hinchey—12.1%
William M. Dotson, Jr—12.1%
E. Donald Arbow—12.1%
Mitchell H. Pike—12.1%
Harold L. Sellick and Marilyn Sellick—6.05%
Ronald W. Petersen—6.05%
Paul S. Buxton and Carolyn Buxton—6.05%
Teras Yurashak—6.05%
Van N. Carrigan—3.02%
Nancy Cole—3.02%
Glenda Dodson—3.02%
Ronald Feigin—3.02%
Michael and Lauri Carrigan—15%

2. *Procedure for Demand.* In the event a default or deficiency appears likely, then the Company's Board of Directors may call for the shareholders to cure or prevent any such deficiency in accordance with the schedule set forth in Paragraph 1 above. In such event, the Board of Directors shall give each shareholder at least two and not more than seven days' notice. The shareholders shall have the time stated in the notice in which to meet their respective obligations.

3. *Failure to Meet Demand.* The obligation to meet any demand made in accordance with this agreement shall be specifically enforceable at law or in equity by the Company. Should any shareholder fail to make any payment required by this agreement, the deficiency shall be made up by the remaining shareholders in accordance with the schedule set forth in Paragraph 1, who shall be entitled to reimbursement from the defaulting shareholder.

IN WITNESS WHEREOF, the undersigned have executed this agreement as of the day and year first hereinabove written.

directors. Moreover, failure to meet a demand would create a right of action in the company alone. The demand provisions therefore failed to duplicate the effect of the Sellicks' allegedly rejected personal guaranties, in failing to create the individual rights of contribution which exist between cosureties.

*The Recital.*

Neither, in my view, did the Sellicks assume the duties of cosureties by their apparent truthful representation that they "ha[d] been asked to and ha[d] agreed to personally guarantee the Company's debt to $600,000." UBA did indeed ask the Sellicks for their guarantees, but unilaterally "decided as an internal policy matter not to accept a guaranty [sic] from Hal and Marilyn Sellick." I cannot agree that the shareholders' quoted recital somehow freed the principal, UBA, to pick and choose which guarantees it would and would not accept, contrary to UBA's alleged promise to each investor (made through "insider" Hal Sellick or otherwise) to accept personal guarantees from each and every shareholder. *See State Bank of East Moline v. Cirivello*, 74 Ill.2d 426, 24 Ill.Dec. 839, 386 N.E.2d 43, 46 (1978) ("By representing that the loan would not be advanced without the personal guarantees of all the limited partners, [the bank officer] was also representing that the guaranty would not become effective unless all ... signed.").

*Conclusion.*

Viewing the evidence and reasonable inferences therefrom in favor of the nonmovant, I conclude that the Estate has alleged facts to establish UBA's material breach of a condition precedent. The shareholders agreement should not be read to immunize the bank from the consequences of its unilateral decision to breach that condition by rejecting the Sellicks' guaranties.