Uwe KALENKA and Ralf Kalenka, Appellants,

v.

William F. TAYLOR, III, d/b/a Colony Builders, William F. Taylor, III, individually, Tami D. Taylor, Dorcas Marie Teall, James C. Sanders, Nancy L. Sanders, Scott J. Shreve, Barbara E.F. Shreve, Bert N. Moma, Sheila D. Moma, and Shelby Johansen, Appellees.

No. S–5678.

Supreme Court of Alaska.

May 26, 1995.

---

Martin A. Farrell, Jr., Anchorage, for appellants.

Timothy M. Stone and Alex K.M. Vasauskas, Stone, Waller & Jenicek, Anchorage, for appellees William F. Taylor, III, d/b/a Colony Builders, William F. Taylor, individually, and Tami D. Taylor.

Gordon F. Schadt and Tracey A. Tillion, Law Offices of Gordon F. Schadt, Anchorage, for appellee Dorcas Marie Teall.

Calvin R. Jones, Hoge & Lekisch, Anchorage, for appellees James C. Sanders, Nancy L. Sanders, Scott J. Shreve, Barbara E.F. Shreve, Bert N. Moma, Sheila D. Moma, and Shelby Johansen.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

### OPINION

MOORE, Chief Justice.

## I. INTRODUCTION

Uwe Kalenka and his brother Ralf brought suit to enforce restrictive covenants which bind nine lots in a subdivision. The defendants are (1) Dorcas Teall, Uwe's former wife, who sold four lots to a developer and approved construction on them; (2) William and Tami Taylor, d/b/a Colony Builders (collectively, the Taylors), who purchased Teall's lots, built single family houses on them, and then resold the properties; and (3) seven people who purchased the properties from the Taylors and now live there (the residents).[1] The Kalenkas appeal from summary judgment against them on all alleged covenant violations. We affirm summary judgment on the major claims but reverse in part.

## II. FACTS AND PROCEEDINGS

While married, Uwe Kalenka and Dorcas Teall purchased property, which they subdivided into nine lots. In 1984 the couple, as "Developer" of the property, recorded a "Declaration of Covenants, Conditions and Restrictions" applicable to the lots. Later that year, the couple sold lot number one to Curt Kutil. No other lots were sold during the marriage.

In 1987 Uwe transferred his interest in the subdivision to his sister Evi Kalenka. In 1988, Uwe and Teall were divorced. Teall received title to Lots 2, 3, 4, and 8 of the subdivision; title to lots 5, 6, 7, and 9 had been conveyed to Evi. In 1990 Evi Kalenka transferred her lots to her brother Ralf. According to Ralf, Uwe retains a right of first refusal to purchase those lots should Ralf decide to sell.

In November 1990 and March 1991, Teall conveyed her lots to the Taylors. In the spring and summer of 1991, after obtaining approval for construction from Teall, the

---

1. The residents are James and Nancy Sanders, Scott and Barbara Shreve, Bert and Sheila Moma, and Shelby Johansen.

Taylors began construction of single family homes on the lots. Teall based her approval of the construction on a set of house plans given to her by the Taylors and a tour of other homes built by the Taylors. Despite the fact that Teall advised them to contact Uwe, the Taylors did not contact him or receive his approval.

All four buildings were substantially completed by mid-summer of 1991, when the Taylors called Evi Kalenka in Germany and expressed an interest in purchasing the remaining lots. Through the Taylors' contact with Evi, Uwe and Ralf became informed of the construction. William Taylor then met with Uwe and Ralf. Ralf informed Taylor that lots 5, 6, 7, and 9 were not for sale and that the construction undertaken by the Taylors was in violation of the covenants. The Taylors then sought and obtained from Teall written permission authorizing their already-completed construction.

The Kalenkas filed suit in late 1991, asserting nine causes of action: one claim accusing Teall of wrongfully authorizing construction and seeking $500,000 in punitive damages; one claim alleging that the residents had purchased homes that violated the covenants and that several residents were violating a covenant prohibiting pets; and seven claims against the Taylors.

The Kalenkas assert that the Taylors violated the covenants by (1) failing to get the Developer's approval to build; (2) building single family homes instead of duplexes; (3) failing to side the houses with redwood or cedar siding; (4) failing to screen construction from view during the erection of the houses; and (5) failing to landscape lots under construction.[2] The Kalenkas seek from the Taylors $1 million in punitive damages for "wilfully violating" the covenants and additional "punitive assessments" of $1000 per day under a covenant provision that sets out

"penalties" for initiating construction without Developer approval. The Kalenkas also seek injunctive relief to force the Taylors and the residents to comply with the Kalenkas' interpretation of the covenants.

The trial court granted summary judgment against the Kalenkas with regard to all alleged covenant violations. The court then entered final judgment on those issues under Civil Rules 54(b), 58, 58.1 and 78. The Kalenkas appeal.

## III. DISCUSSION [3]

### A. The Covenant Violation Claims

■ In urging this court to affirm the entry of summary judgment, the defendants argue that the covenants have been waived or abandoned. They also argue that their construction of single family houses with grooved plywood siding complies with the covenants. Finally, they argue that even if their construction does not comply with the covenants, Dorcas Teall's approval of their actions immunizes them from claims brought under the covenants.

We hold that the defendants have not shown that the covenants were waived or abandoned. We do agree, however, that Dorcas Teall's approval of the construction is sufficient grounds for granting summary judgment on the claims that the houses' materials and design violate the covenants. We also hold that the construction of single family homes does not violate the covenants and that the claims regarding landscaping were properly dismissed. We further hold that summary judgment was properly entered against the Kalenkas' major damages claims. We conclude, however, that a pair of the Kalenkas' less important claims should have survived summary judgment.

2. The Kalenkas also claimed that the Taylors negligently damaged trees and vegetation on one lot and a water valve on another. Summary judgment was not entered on these two claims, and thus they are not before this court.

3. We will affirm summary judgment if the record fails to disclose a genuine issue of material fact, drawing all reasonable inferences in favor of the Kalenkas, and the defendants are entitled to

judgment as a matter of law. *Dayhoff v. Temsco Helicopters, Inc.,* 772 P.2d 1085, 1086 (Alaska 1989). Where, as here, the trial court fails to specify a basis for summary judgment, there is a presumption that it ruled in the movant's favor on all grounds put forth. *Estate of Arbow v. Alliance Bank,* 790 P.2d 1343, 1345 (Alaska 1990).

**1.** *The covenants were not waived or abandoned*

█ The defendants argue that Uwe and Dorcas abandoned covenants on building type, landscaping, shielding construction from view, and pets. They base this assertion on the allegation that those covenants were not enforced against the first dwelling in the subdivision, which was built in 1984 by Curt Kutil on lot number one. The defendants contend that the Kutil house was not a duplex, that it was not landscaped, that the construction was not screened, that the residents kept pets, and that Uwe and Dorcas acquiesced in these covenant violations.

We have said that covenants will be deemed waived if the "evidence reveals substantial and general noncompliance." *B.B.P. Corp. v. Carroll,* 760 P.2d 519, 523–24 (Alaska 1988). In adopting the "substantial and general noncompliance" standard, *B.B.P. Corp.* cited authority from a number of other states, including Hawaii, Washington, and Nevada. An examination of the law in those and other jurisdictions reveals that a failure to enforce covenants against a single property does not constitute abandonment. *See Sandstrom v. Larsen,* 59 Haw. 491, 583 P.2d 971, 976–77 (1978); *Tompkins v. Buttrum Constr. Co.,* 99 Nev. 142, 659 P.2d 865, 867 (1983); *Swaggerty v. Petersen,* 280 Or. 739, 572 P.2d 1309, 1314–15 (1977); *Crimmins v. Simonds,* 636 P.2d 478, 480 (Utah 1981); *Mt. Baker Park Club v. Colcock,* 45 Wash.2d 467, 275 P.2d 733, 735–36 (1954). Consistent with this authority, we hold that the Kalenkas' alleged non-enforcement of covenants with regard to lot one does not rise to the level of "substantial and general noncompliance." Therefore, the covenants in this case have not been abandoned.

**2.** *Summary judgment was properly granted on the Kalenkas' claims that the construction of single-family houses with plywood siding violated the covenants*

█ The defendants argue that since Teall approved the Taylors' construction of single family homes with plywood siding, summary judgment was properly entered against the claims that the houses' design and materials violate the covenants. The Kalenkas resist this conclusion. They argue that the Taylors did not provide Teall with the detailed construction application required by the covenants, and contend that Teall's approval amounted to an illegitimate modification of the covenants. The Kalenkas cite *Young Bros. Construction Co. v. Rollins Burdick Hunter, Inc.,* 659 P.2d 1168 (Alaska 1983), for the proposition that acting alone, Teall lacked the power to approve the Taylors' construction.

*Young Bros.* is inapplicable here, however. In *Young Bros.,* we held that a joint venturer lacked the power to execute a promissory note on behalf of the joint venture without the knowledge and permission of his co-venturers. This holding was based in part on the fact that the joint venture agreement explicitly provided that no party could borrow money or use credit without the written consent of the other co-venturers. *Id.* at 1169.

Unlike the joint venture agreement in *Young Bros.,* which explicitly required the approval of all co-venturers before any party indebted the joint venture, the covenants at issue here do not clearly require the consent of both Uwe and Teall to achieve the approval of a construction proposal. The covenants require the approval of a singular "Developer." The covenants do state that "Uwe Kalenka and Dorcas Kalenka [are] hereinafter called the Developer," but they also state that "the Developer is the owner of the real property [governed by the covenants]." It is thus at least arguable that Dorcas Teall has the ability to grant construction approval by herself: she is called "the Developer" (although this is in conjunction with Uwe); additionally, the Developer is referred to as the "owner of the real property," and Teall was the sole owner of the lots on which the Taylors built their houses.

█ We have held that "[b]ecause restrict[ive covenants] are in derogation of the common law, they should not be extended by implication and doubts should be resolved in favor of the free use of land." *Gordon v. Brown,* 836 P.2d 354, 357 (Alaska 1992); *Lamoreux v. Langlotz,* 757 P.2d 584, 587 (Alas-

ka 1988). Applying this standard to the question of whether Dorcas Teall could approve the Taylors' construction, we hold that the covenants must be interpreted to validate the authorization Teall gave to the Taylors.

It follows from this that summary judgment was correctly entered with regard to the Kalenkas' claims that the houses' design and materials violated the covenants. Moreover, summary judgment was properly entered against the claims accusing the Taylors of breaching the covenants by failing to obtain architectural approval from Uwe, and charging Teall with "wrongfully authoriz[ing] Taylor to build lesser quality single family residences."

■ These results are bolstered by our conclusion that the covenants do not prohibit the construction of single family houses. The parties cite *Collins v. Goetsch*, 59 Haw. 481, 583 P.2d 353 (1978), in support of their opposing positions on this issue. *Collins* involved an attempt to prevent property owners from constructing a duplex on property restricted by the following covenant:

> Said lot shall contain no more than one single-family dwelling, except, where a second living unit is legally permitted, any such second unit shall be a part of and annexed to the main dwelling, and maintain an outward appearance of a single-family dwelling rather than of a duplex.

*Id.* at 356. The property was zoned to allow duplexes. The court, following the rule that covenants are to be strictly construed in favor of the free use of land, held that the property owners were not prohibited from constructing a duplex on the lot, so long as it maintained the appearance of a single family dwelling. *Id.* at 358. The court noted that "if the drafters of the covenants had intended that no duplexes were to be built in the subdivision, they could easily have so provided in the covenant." *Id.*

The Taylors seize on this reasoning and apply it to this case. They also note the *Collins* court's dictum that "[s]uch an explicit prohibition [on duplexes] was particularly necessary where the existing zoning for the subject property permitted" such dwellings. 583 P.2d at 359. The Kalenka subdivision's zoning permits both duplexes and single family homes. The Taylors conclude that given this zoning classification, and since the covenants here fail to dictate "no single-family homes," a strict reading of the covenants allows their construction. The Kalenkas argue that the covenant in *Collins* had a broad exception clause ("where [duplexes are] legally permitted") that is not present here with regard to single family homes. They also argue that zoning is irrelevant to the interpretation of covenants, which are a purely private form of structuring land use.

■ The Kalenkas' argument about the interrelationship of covenants and zoning ordinances is correct. *See Singleterry v. City of Albuquerque*, 96 N.M. 468, 470, 632 P.2d 345, 347 (1981) (zoning ordinances cannot relieve private property from valid restrictive covenants even though the ordinances are less stringent). The fact remains, however, that the principle of strict construction enunciated in *Collins* has also been adopted in Alaska. *See Gordon*, 836 P.2d at 357.

A thorough reading of the covenants reveals that while they clearly envision multiple-unit dwellings, they contain no express prohibition on the construction of single-family homes.[4] Applying *Gordon*'s strict construction, we hold that the covenants at issue allow the construction of single-family homes.

---

4. The relevant provisions of the covenants on building type, with emphasis added, are
  • The Preamble declares the Developer's desire for a "high quality community with attractive building designs ... *within the duplex area* and in common areas."
  • Article I, Section 1, "Land Use," states that every building shall provide "sufficient parking for *each and every unit* within the building."
  • Article I, Section 5, "Dwelling Sizes and Completion," provides:

  Each building shall contain at least the following areas, excluding porches, garages, covered patios, sundecks, carports or garages:
  *Du–Plex*—Minimum 2,400 square feet (gross floor area); minimum of 2 bedroom units. No other type of building is discussed.
  • Article I, section 5 also requires minimum exterior storage space *"per dwelling unit."*

### 3. The remaining covenant violation claims

We now discuss summary judgment entered against the Kalenkas' remaining claims: the charge that the Taylors violated the covenants by failing to screen construction from public view; the charge that two of the residents are violating the covenants prohibiting pets; and the charge that both the Taylors and the residents have violated the covenant requiring landscaping.

■ Summary judgment was properly entered on the claim that the defendants violated the covenants' landscaping requirement. The relevant covenant provides that all required landscaping work must be completed "within one year following issuance of Certificate of Occupancy for the residence." At the time of the defendants' summary judgment motion, a year had not elapsed since the homes had been completed. The claims that the Taylors and the residents violated the landscaping covenant were therefore premature and properly dismissed through summary judgment.[5]

■ We see no grounds on which to support summary judgment dismissal of the remaining claims, however. The defendants do not argue that these claims are factually infirm. Instead, they contend that Teall "knowingly waived or abandoned any restrictions regarding screening of construction, pets, ... [and] tree planting." An examination of the record, however, does not support this assertion; rather, the record indicates only that Teall believed the covenants at issue had been abandoned. We have rejected the abandonment argument. *See* A.1, *supra.* Moreover, Teall's approval of the design, materials, and construction of the houses has no bearing on the alleged violation of covenant provisions dealing with screening construction, pets, and landscaping. Consequently, summary judgment is reversed on the Kalenkas' claims that the Taylors failed to shield construction and that several residents are violating the covenant that prohibits pets.[6]

### B. The Kalenkas May Not Pursue Punitive Damages and/or $1000 Per Day "Penalties"

The Kalenkas sought both punitive damages against the Taylors and Dorcas Teall, and additional "assessed penalties" against the Taylors. We affirm the trial court's dismissal of both of these types of claimed damages.

■ The Kalenkas' breach of covenant claims sound in contract, rather than tort. Punitive damages are unavailable in a contract claim, and a contract claim cannot be transmuted into one that gives rise to punitive damages simply by alleging that the defendants violated the covenants "wilfully and with reckless disregard for the Kalenkas' interest." *See Lee Houston & Assocs. v. Racine,* 806 P.2d 848, 856 (Alaska 1991) (" '[P]unitive damages are not recoverable for breach of contract unless the conduct constituting the breach constitutes an independent tort.' ") (quoting *ARCO Alaska, Inc. v. Akers,* 753 P.2d 1150, 1153 (Alaska 1988)); *Walt v. State,* 751 P.2d 1345, 1354 (Alaska 1988) (punitive damages unavailable because claimant "assert[ed] no recognizable tort claims").[7] Accordingly, summary judgment was properly entered on the Kalenkas' claims for punitive damages.

■ The Kalenkas also seek "[a]ssessed penalties" under two provisions of the covenants which provide:

Architectural Control and Penalty: No construction, clearing or site grading shall

---

5. The fact that the Taylors no longer owned the properties when this lawsuit was filed is an additional reason why they could not be charged with a violation of the landscaping covenant.

6. We note, however, that since the Kalenkas do not live in the subdivision and indeed did not even know of the construction until it was nearly finished, it is difficult to see what damages they will be able to show as a result of the Taylors' failure to screen construction.

7. This is not a case involving the bad faith breach of an insurance contract, where we have ruled that punitive damages are available. *State Farm Fire & Cas. Co. v. Nicholson,* 777 P.2d 1152, 1156 (Alaska 1989). Additionally, while the Kalenkas' complaint claims that the Taylors "fraudulent[ly] breach[ed]" the covenants, they have failed to show or even allege any elements of fraud.

begin until the Developer has approved the proposed construction. A *penalty* of $1000.00 per day shall be assessed for unapproved construction.

Architectural Control Procedures: No building ... shall be constructed without the express approval of the Developer. Failure to obtain the Developer's approval prior to making an improvement to the land shall cause an *Automatic Punitive Assessment* to be levied in the amount of One Thousand Dollars ($1000) per day for each day following commencement of construction until the Developer [sic] approval is delivered.

(Emphasis added.)

Our analysis of this claim for "penalties" is facilitated by the commentary to the Restatement (Second) of Contracts § 356 (1981), which states:

[T]he parties to a contract are not free to provide a penalty for its breach. The central objective behind the system of contract remedies is compensatory, not punitive. Punishment of a promisor for having broken his promise has no justification on either economic or other grounds, and a term providing such a penalty is unenforceable on grounds of public policy.

*Id.* § 356 cmt. a.

■ We have voiced our agreement with the Restatement's disapproval of punitive contractual damages, *Zerbetz v. Alaska Energy Ctr.*, 708 P.2d 1270, 1281 (1985), and are inclined to disallow the "penalties" sought by the Kalenkas based on their moniker alone. Our inclination is strengthened by the fact that the "penalty" provisions exhibit the classic signs of impermissible liquidated damages. Quantified contractual damages are illegitimate

where there is no attempt to calculate the amount of actual damages that might be sustained in case of breach. An indication of this lack of calculation is deemed pres-

ent when the amount of stipulated damages is the same for a total or partial breach, or for breach of minor or major contract provisions.

*Unified Sch. Dist. No. 315 v. DeWerff,* 626 P.2d 1206, 1209 (Kan.App.1981) (citation omitted). The penalty provisions at issue here suffer from this failure to distinguish between different degrees of covenant violations. As the Taylors note, "[a]n unapproved alteration to a fence calls for the same penalty as the unapproved construction of a building." Consequently, we hold that, as is true regarding punitive damages, the "assessed penalties" sought by the Kalenkas are impermissible. Summary judgment on the damages claims is affirmed.

C. *The Trial Court's Award of Attorney's Fees Should Not Be Disturbed*

■ On April 5, 1993, the superior court entered judgment on the Kalenkas' covenant violation claims and awarded attorney's fees to the defendants. The Kalenkas did not include the issue of fees in their Statement of Points on Appeal, filed May 7. Nor did they later amend their Points on Appeal and/or supplement the record to include the fees issue; consequently, the record is bereft of information on the question. They now wish to appeal the fee award as excessive. [At.Br. 31–32]

■ Because they failed to properly appeal the fee award and have offered no mitigating circumstances to explain their failure to amend the Points on Appeal, the Kalenkas are precluded from raising the issue here. Alaska R.App.P. 204(e); *Oceanview Homeowners Ass'n v. Quadrant Constr. & Eng'g,* 680 P.2d 793, 797 (Alaska 1984) (absent mitigating circumstances, issues omitted from Statement of Points on appeal will not be considered).[8]

8. The defendants have succeeded in dismissing the most significant claims of covenant violation. They have also successfully prevailed on the Kalenkas' claims for $1.5 million in punitive damages and untold thousands in "penalties." Consequently, our decision to reverse summary judgment on the claims concerning the screening of construction and the residents' pets does not alter the defendants' status as prevailing parties. *See Apex Control Sys., Inc. v. Alaska Mechanical, Inc.,* 776 P.2d 310, 314 (Alaska 1989) ("A litigant may be the prevailing party if successful with regard to the main issue, even if the other party receives some affirmative recovery.").

## IV. *CONCLUSION*

The judgment of the trial court is AF-FIRMED, with the exception of summary judgment granted against the Kalenkas' claims that the Taylors violated the covenant requiring screening of construction and that some residents are in violation of the covenant prohibiting pets. Summary judgment on those two claims is REVERSED and REMANDED to the trial court.