*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DOUGLAS GALIPEAU, | ) | |
| | ) | Supreme Court No. S-17365 |
| Appellant, | ) | |
| | ) | Superior Court No. 3VA-17-00021 CI |
| v. | ) | |
| | ) | O P I N I O N |
| BRIANA BIXBY, as Trustee of the | ) | |
| Irrevocable Trust of Rose E. Fong and | ) | No. 7491 – November 13, 2020 |
| individually, and MEI-LANI BIXBY, | ) | |
| individually, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Valdez, Jonathan A. Woodman, Judge.

Appearances: Susan Orlansky and Brian J. Stibitz, Reeves Amodio LLC, Anchorage, for Appellant. William Bixby, Law Office of William Bixby, Benicia, California, for Appellees.

Before: Bolger, Chief Justice, Maassen, and Carney, Justices. [Winfree, and Stowers, Justices, not participating.]

MAASSEN, Justice.

## I. INTRODUCTION

A property owner cut down trees on his lot to build a cabin. The trees were protected by his subdivision's Declaration of Covenants, Conditions, and Restrictions

(CCRs) and could not be cut down without prior approval. The owners of an adjacent lot sued him. The superior court found the property owner liable and, following a two-day non-jury trial, awarded the neighbors compensatory restoration damages and punitive damages.

The property owner appeals, arguing that the superior court erred in both damages awards. We agree. There was no basis in the evidence for an award of restoration costs when the trees would not be restored, and there was no evidence to support an award based on a loss of value to the neighbors' property. Nor was there proof of an independent tort as necessary to support a punitive damages award in a case premised on the breach of CCRs. We therefore vacate the superior court's judgment and remand for entry of a nominal damages award.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

This appeal stems from a dispute between owners of adjacent lots in a Valdez subdivision: Douglas Galipeau, owner of Lot 3, and Briana and Mei-Lani Bixby, owners of Lot 4. The subdivision's lots are subject to CCRs which the original developers recorded and filed with the City of Valdez. The CCRs give enforcement rights to the declarants and any other subdivision property owner. This appeal concerns Article II, Section 7 of the CCRs, which states the declarants' "specific desire . . . to maintain the maximum natural beauty and [a]esthetic value of the subject property" and mandates that "in no event . . . shall any 'evergreen' type tree having a trunk measuring six (6) inches or more in diameter at a height of four (4) feet from ground level be destroyed or removed from any lot unless specifically approved by the Architectural Committee." The section further states that if the Committee fails to approve or reject any building or maintenance plans submitted to it within 60 days, "approval will not be required" and the CCRs "will be deemed to have been fully complied with."

The Bixby sisters grew up in a house on Lot 4. They both left Valdez after high school and at the time of trial lived in California. Their mother operated a bed and breakfast in the family home, but it closed in 2016 after she passed away, and the sisters inherited the home from their mother's trust.

Galipeau purchased the adjoining Lot 3 in June 2013. The lot had never been developed, but Galipeau believed the previous owner had submitted a site plan to the City. Intending to build a cabin, he hired a company to remove several trees from the lot. He concedes that he never requested or received Committee approval for this action.

## B.    Proceedings

In April 2017 the Bixbys sued Galipeau, alleging that he breached the CCRs and committed trespass by cutting protected trees on his property without Committee approval. They sought money damages to restore the property, punitive damages, and injunctive relief. In his answer Galipeau admitted that he was the legal owner of Lot 3 and that he "cut, or caused to be cut, certain trees on [his] Lot in anticipation of building a home there."

The court granted partial summary judgment to the Bixbys, finding that there were no genuine issues of material fact regarding Galipeau's liability for cutting down the trees in violation of the CCRs.[1] The court then granted a second motion for partial summary judgment in favor of the Bixbys, concluding that Galipeau was also

---

[1]    Galipeau's appeal does not challenge the court's finding of liability, conceding that "the evidence presented to the superior court established that he violated a covenant by cutting, or otherwise downing, without permission from the subdivision's Architectural Committee, a number of 'protected trees.' "

liable for punitive damages under AS 09.45.730[2] and AS 09.17.020.[3]   The court concluded that "a plaintiff seeking damages for trees destroyed or felled on defendant's land can seek the same damages as th[e] plaintiff would be entitled to if defendant had committed trespass by cutting trees on plaintiff's land."  Therefore, it explained, the only remaining issues for trial were "the amount of compensatory restoration damages and the amount of punitive damages."

### 1.   The superior court held a non-jury trial on damages.

The court held a two-day bench trial in June 2018.  The court first deemed admitted the Bixbys' discovery requests regarding punitive damages because Galipeau had failed to respond, and it granted the Bixbys' motion to exclude most of Galipeau's witnesses and all of his exhibits because they had not been timely filed.

The Bixbys' first witness was arborist Maria D'Agostino, an expert in "tree appraisals" and the "replacement and care of trees."  D'Agostino had visited Galipeau's lot in September 2017 and observed three downed trees and ten stumps of varying sizes between 14 and 38 inches.[4]  She testified that trees of this size were "too large to be replaced with commonly available nursery stock."  She estimated that each tree would cost "around $4,200" to replace, that the value of the three downed trees was $67,000, and that the value of the ten trees originally atop the stumps was $311,000.  She

---

[2]     The statute imposes "treble the amount of damages that may be assessed in a civil action" for the act of cutting down trees owned by another, or trees in common ownership, "without lawful authority."

[3]     The statute codifies the procedure for submitting punitive damages claims to the trier of fact and the elements necessary to support such an award.

[4]     Tree size is determined by the "trunk formula" industry standard which measures the trunk diameter at breast height.  Only one of the trees Galipeau downed was measured using this standard; the other trees could not be measured at the necessary height.

explained that successfully moving living trees of the same size "would be extremely unlikely" and such a move would be "[p]rohibitively expensive" and "far more than the [trees'] value."[5]

Next to testify was Mary Jo Evans, one of the original developers of the subdivision and a current member of the Committee. Like D'Agostino, she testified that the subdivision's trees helped moderate the wind. She also testified that Galipeau never sought Committee approval or submitted plans to the Committee, noting that she has "never spoken with him."

The Bixbys also testified. They explained that neither of them had permanently lived in the Lot 4 house since high school and the only current occupant was a renter in the basement unit. They testified that the B&B had not been in operation since 2016 and that neither of them had any firm plans to reopen it. But Mei-Lani testified that the loss of the trees made their house more susceptible to wind damage and reduced their privacy; they now had to keep the blinds closed on the side of the house that faced Galipeau's lot. Briana testified that she was worried about increased heating costs, though she could not provide exact figures because they kept their house's temperature at the minimum level necessary to prevent frozen pipes. Both sisters also noted the emotional impact the trees' loss had on them: Briana was angry and upset after learning that she could no longer enjoy the trees' presence as she had in her childhood, and Mei-Lani testified that the loss of the trees affected her on a "personal and emotional level."

On the second day of trial the court noted for the record that it had visited Lot 3 to better understand its layout and what had occurred. Galipeau testified next. He

---

[5] D'Agostino explained that replanting even six-inch trees, which would take 35-40 years to grow to the approximate size of the trees Galipeau downed, is "generally not done" because smaller trees adapt more easily.

said that a 1980s site plan for Lot 3 was on file with the City of Valdez and had been approved by a city building inspector. He testified that he had hired a company to "push out" the northwest side of his lot and knock down some trees. He admitted he had never obtained the Committee's permission.

### 2. The superior court awarded both compensatory and punitive damages.

In December 2018 the court issued its written findings of fact and conclusions of law. The court found that Galipeau was aware of the CCRs before he purchased Lot 3, that he knew the CCRs prohibited cutting down protected trees without Committee approval, and that he cut down prohibited trees "intentionally and voluntarily." The court accepted D'Agostino's testimony about the number of protected trees that were cut and her estimates of their replacement cost and overall value. The court stated that D'Agostino testified that the value of the trees was $4,200 each and their total replacement cost would be $380,000.[6]

The court explained that Galipeau's "violation of the restrictive covenant amounted to a breach of contract." It held that the Bixbys were entitled to compensatory restoration damages but noted that the actual restoration of the trees was "untenable" given the "extreme animosity between these parties" and the likelihood that Galipeau would "actively work to thwart the survival" of any replacement trees. It awarded the Bixbys $54,600 for "the value of the thirteen trees."

The court decided that punitive damages were also available because Galipeau's "conduct constituting the breach of contract would be considered an

---

[6] The court appears to have misrecalled D'Agostino's testimony. She testified that the *value* of the ten trees represented by the stumps was $311,000 and the *value* of the three downed trees was $67,000, explaining that there was a difference between what the trees were worth and their replacement cost. She estimated that the replacement cost to purchase and install new six-inch trees was about $4,200 per tree.

independent tort — *e.g.*, waste, private nuisance, or trespass to trees." It held that Galipeau's conduct "amounted to [a] reckless indifference to the rights of others, and conscious action in deliberate disregard of those rights," highlighting that if Galipeau had cut down trees on the Bixbys' property the Bixbys would be entitled to not only compensatory restoration damages but also statutory treble damages.[7] Finding the case analogous to a trespass to trees case, and finding Galipeau's conduct "egregious, willful, extreme, and outrageous," the court awarded the Bixbys treble damages in the amount of $163,800. The court also ordered a permanent injunction and awarded the Bixbys prejudgment interest and attorney's fees.

Galipeau appeals.

## III.   STANDARD OF REVIEW

"A trial court's determination of damages is a finding of fact which we affirm unless it is clearly erroneous. But we apply our independent judgment in deciding whether the trial court's award of damages is based on an erroneous application of law."[8] "Statutory interpretation is also a question of law, which we review de novo."[9]

---

[7]   *See* AS 09.45.730. The court read the treble damages provision as authorizing compensatory damages plus three times that amount as punitive damages, instead of a total award three times the compensatory damages. *Cf. Wiersum v. Harder*, 316 P.3d 557, 571 n.1, 573 (Alaska 2013) (Fabe, C.J., concurring) (tripling the base award of $40,000 to make the total award $120,000 in a case brought under AS 09.45.730).

[8]   *Haines v. Comfort Keepers, Inc.*, 393 P.3d 422, 427 (Alaska 2017) (quoting *Beaux v. Jacob*, 30 P.3d 90, 97 (Alaska 2001)); *see Erwin v. Mendenhall*, 433 P.3d 1090, 1094 (Alaska 2018) ("We 'review de novo whether the trial court correctly applied legal rules pertaining to damages and prejudgment interest.' " (quoting *City of Seward v. Afognak Logging*, 31 P.3d 780, 783 (Alaska 2001))).

[9]   *Madonna v. Tamarack Air, Ltd.*, 298 P.3d 875, 878 (Alaska 2013).

## IV. DISCUSSION

### A. It Was Error For The Superior Court To Award Compensatory Restoration Damages.

The superior court's finding that "[t]he violation of the restrictive covenant amounted to a breach of contract" is not challenged on appeal. From its finding of liability the court went on to craft a compensatory damages remedy by reference to the trees' value, awarding $4,200 per tree for a total of $54,600.[10]

Galipeau challenges this award on a number of grounds. He argues that it had "no bearing . . . on the damages that the Bixbys sustained," which included only a general loss of privacy and aesthetics and the negative effects of increased wind exposure, none of which the Bixbys attempted to value in dollar terms. He contends that the Bixbys never discussed any plans to plant trees on their own property "to reduce the effects of losing trees" next door, instead presenting expert testimony only on the value of the trees that were cut — which were Galipeau's trees, not theirs.

We begin our analysis with the observation that "breach of covenant claims sound in contract, rather than tort."[11] We have held that "a plaintiff alleging breach of contract must present evidence sufficient to calculate the amount of the loss caused by the breach"; while this amount need not be proven with "exact detail," it "must provide a reasonable basis" for the fact finder's determination.[12] Damages may not be awarded for "mere breach"; rather, "the amount of damages awarded must correspond to injuries

---

[10] As noted above, the court appears to have used the trees' replacement cost rather than their value. *See supra* p. 6 and note 6.

[11] *Kalenka v. Taylor*, 896 P.2d 222, 228 (Alaska 1995).

[12] *Ben Lomond, Inc. v. Schwartz*, 915 P.2d 632, 636 (Alaska 1996) (quoting *City of Palmer v. Anderson*, 603 P.2d 495, 500 (Alaska 1979)).

resulting from the breach.  The proper measure of recovery for a breach of contract claim is the loss or damage actually sustained."[13]

As Galipeau correctly observes, the superior court made no findings about the damage the Bixbys "actually sustained," characterizing their losses as "of an aesthetic nature" and "difficult to quantify."  The Bixbys did not attempt to quantify their aesthetic loss in dollar terms.  They did not present evidence of their lot's market value or how that value may have been affected by the loss of trees.  Several witnesses testified that the house was now more exposed to the wind, but no one attempted to quantify the problem in dollar terms;  Briana testified, in fact, that wind had always been an issue because of where the house was situated.  And although Briana also testified that the loss of the buffer could affect their heating costs, she conceded, "[W]e don't know for sure what that's doing to our heat bill because we run the house at just maintenance levels while we're gone."

Thus, in making its damage award, the superior court was faced with the problem of putting a dollar amount on the Bixbys' "difficult to quantify" — and in fact unquantified — harms.  Finding that the Bixbys had "a reason personal for restoring the property to its original condition" which entitled them "to compensatory restoration damages," the court further found that "an award of restoration damages is untenable in this case" because of the animosity between the parties; in other words, it recognized that

---

[13] 24 WILLISTON ON CONTRACTS § 64:12 (4th ed. May 2020 Update) (footnote omitted).  Of course, "any breach of contract entitles the injured party to at least nominal damages, [but] that party cannot recover more without establishing a basis for an inference of fact that he or she has been actually damaged." *Id.* (footnote omitted). "If the breach caused no loss or if the amount of the loss is not proved . . . [,] a small sum fixed without regard to the amount of loss will be awarded as nominal damages." RESTATEMENT (SECOND) OF CONTRACTS § 346 (AM. LAW INST. 1981).

money to buy new trees would not go toward replacing the old trees.[14] The court therefore awarded a sum it determined to represent the cut trees' value (though the testimony shows that the amount actually reflected the restoration cost, a significantly lower amount). But whether the amount represented the trees' restoration cost or their value, the superior court plainly intended it to be a proxy for the Bixby's own unquantified harm.

The use of restoration cost as a measure of damages in this case was error. Relying on the Restatement (Second) of Torts, we have held that restoration costs are an appropriate measure of damages only if those costs (1) are not "disproportionately larger than the diminution in the value of the land" *and* (2) there is a " 'reason personal to the owner for restoring' the land to its original condition."[15] Here, in the absence of evidence of "the diminution in the value of the land," there was no basis on which to make a finding one way or the other whether the restoration costs were disproportionately high.

The second requirement for using the restoration cost measure — a "reason personal" to the Bixbys — also lacks support in the record. A "reason personal" for

---

[14] The superior court found, and neither party disputes, that "there is insufficient room between the window and the property line to replace the trees on [the Bixbys'] property. The only way this view could be restored is by replanting trees on [Galipeau's] land."

[15] *Osborne v. Hurst*, 947 P.2d 1356, 1359 (Alaska 1997) (citing RESTATEMENT (SECOND) OF TORTS § 929(1)(a) cmt. b (AM. LAW INST. 1977)); *see also Andersen v. Edwards*, 625 P.2d 282, 289 (Alaska 1981) (noting that restoration costs are inappropriate in situations "where there is [not] a reasonable likelihood that the trees will be restored"); *Chung v. Rora Park*, 339 P.3d 351, 353 (Alaska 2014) (noting that replacement costs for trees removed from a plaintiff's property are an inappropriate measure of damages when they disproportionately exceed the loss in value of the land and "there is no reason personal to the owner for restoring the land to its original condition" (quoting *Osborne*, 947 P.2d at 1359)).

restoring property to its original condition "exists where the owner holds property primarily for use rather than for sale *and* where the owner is likely to make repairs with the restoration costs award rather than to pocket the funds and enjoy a windfall."[16] In its second summary judgment order on liability, the court listed a number of reasons why the Bixbys had a "reason personal," including "the beauty, ornamental nature, location, quality, and size of the protected trees" and the Bixbys' "sentimental attachment to the unique setting, privacy, and views created by the protected trees," all of which led the court to conclude that the Bixbys were "likely to actually restore the property to its original state rather than enjoy the windfall received from payment of compensatory restoration damages." But these findings were made on an unopposed motion for summary judgment, and the court's decision changed following trial, when it found that "actual restoration of the trees is untenable." If a complaining landowner does not demonstrate a "reasonable likelihood that the trees w[ill] be restored," then "the appropriate measure of damages [i]s the diminution in value of the property or the economic value of the timber that was cut."[17] On the facts found at trial, thus, an award to the Bixbys of restoration costs would amount to an unacceptable "windfall," and the court was required to look to other measures.

As noted above, the Bixbys presented no evidence of "diminution in value of [their] property."[18] That leaves only "the economic value of the timber that was cut"[19]

---

[16]     *Osborne*, 947 P.2d at 1359 (emphasis added).

[17]     *Wiersum v. Harder*, 316 P.3d 557, 568 (Alaska 2013) (citing *Andersen v. Edwards*, 625 P.2d 282, 289 (Alaska 1981)).

[18]     *Id.*

[19]     *Id.*

as a possible measure of their damages.[20]  But "the timber that was cut" had no economic value to the plaintiffs; the cut trees were not the Bixbys' trees, and they could not have sold them for timber.[21]  And the market price received for Galipeau's cut trees has no apparent relation to the Bixbys' loss of aesthetics, diminution in property value, and exposure to the wind.

In short, as we have defined these damages remedies in the past, the Bixbys were not entitled to damages based on restoration costs or the value of the cut trees. Rather, their damages remedy lay in proof of "diminution in the value of their property,"[22] but they presented no evidence on that issue and the court made no findings about it.  We must therefore conclude that it was error for the superior court to award compensatory damages in anything other than a nominal amount.[23]

## B. It Was Error For The Superior Court To Award The Bixbys Punitive Damages.

### 1. Punitive damages are not available because Galipeau's breach of contract did not constitute an independent tort.

We have consistently held that "[p]unitive damages are not recoverable for breach of contract unless the conduct constituting the breach constitutes an independent

---

[20]  *Id.*

[21]  The economic value of timber is otherwise known as "stumpage value," defined as "the market value of a tree before it is cut; the amount that a purchaser would pay for a standing tree to be cut and removed."  *Porter v. Kirkendoll*, 421 P.3d 1036, 1040 n.2 (Wash. App. 2018) (citing David H. Bowser, *"Hey, That's My Tree!" — An Analysis of the Good-Faith Contract Logger Exception from the Double and Treble Damage Provisions of Oregon's Timber Trespass Action*, 36 WILLAMETTE L. REV. 401, 405 (2000)), *aff'd in part, rev'd in part*, 449 P.3d 627 (Wash. 2019).

[22]  *Wiersum*, 316 P.3d at 568.

[23]  *See* 24 WILLISTON ON CONTRACTS § 64:12 (4th ed. May 2020 Update); RESTATEMENT (SECOND) OF CONTRACTS § 346 (AM. LAW. INST. 1981); *supra* note 13.

tort,"[24] applying this holding specifically to breaches of restrictive covenants in *Kalenka v. Taylor*.[25] The plaintiffs in *Kalenka* sued to enforce restrictive covenants on nine subdivision lots, seeking punitive damages for willful violation of the covenants and to enforce a penalty provision.[26] We observed, however, that the "breach of covenant claims sound in contract, rather than tort."[27] We reiterated the principle that "[p]unitive damages are unavailable in a contract claim, and a contract claim cannot be transmuted into one that gives rise to punitive damages simply by alleging that the defendants violated the covenants 'wilfully and with reckless disregard' for the [property holder's] interest."[28]

The superior court in this case justified its award of punitive damages by determining that "[t]he conduct constituting the breach of contract would be considered an independent tort — *e.g.,* waste, private nuisance, or trespass to trees; therefore, punitive damages are available." The court reached the amount of punitive damages by relying on the trespass to trees statute, AS 09.45.730, observing that this case was "analogous." Because AS 09.45.730 allows the trebling of compensatory damages in cases of intentional and voluntary trespass, the court trebled the restoration costs awarded as compensatory damages to reach its punitive damages award.

---

[24] *ARCO Alaska, Inc. v. Akers*, 753 P.2d 1150, 1153 (Alaska 1988); *see also Wien Air Alaska v. Bubbel*, 723 P.2d 627, 631 (Alaska 1986) (noting that "awarding punitive damages [in contract cases] would be inconsistent with the [compensatory] policy behind contract damages").

[25] 896 P.2d 222, 228 (Alaska 1995).

[26] *Id.* at 224-25.

[27] *Id.* at 228.

[28] *Id.*

Again, we must conclude that this damages award was error; this case is governed by the rule articulated in *Kalenka* that a breach of CCRs is a breach of contract, not a tort, even if done willfully and intentionally.[29]  And we disagree that Galipeau's conduct can "be considered an independent tort."  An independent tort, by definition, is one that would exist even if there were no contract;[30] here, Galipeau owed no duty to the Bixbys to refrain from cutting his own trees *except for* the contractual duty imposed by the CCRs.

The first independent tort the superior court found possibly applicable was waste.  An action for waste is governed by AS 09.45.740, which provides a right of action to "a guardian, tenant for life or years, or tenant in common of real property" for "waste on the property."  Referencing the statutory remedy, we have defined waste as occurring "when the owner of a possessory estate engages in unreasonable conduct that results in physical damage to the land and substantial diminution in the value of estates owned by others *in the same land*."[31]  Although the Bixbys urge us to give the statute an expansive reading due to its remedial nature, a liberal reading does not allow us to ignore

---

[29]     *Id.*

[30]     *See, e.g., Bayerische Landesbank, N.Y. Branch. v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012) ("Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated."); *Gita Sports Ltd. v. SG Sensortechnik GmbH & Co. KG*, 560 F. Supp. 2d 432, 442 (W.D. N.C. 2008) ("Under the independent tort doctrine, 'a plaintiff must allege a duty owed him by defendant which is separate and distinct from any duty owed under a contract.' " (citation omitted)); *Toyota-Lift of Minn., Inc. v. Am. Warehouse Sys., LLC*, 868 N.W.2d 689, 696 (Minn. App. 2015) ("An independent tort may accompany a breach of contract when the defendant has a legal duty to the plaintiff arising separately from any duty imposed in the contract."), *aff'd*, 886 N.W.2d 208 (Minn. 2016).

[31]     *McKibben v. Mohawk Oil Co.*, 667 P.2d 1223, 1228 (Alaska 1983) (emphasis added).

the statute's plain language. The remedy is clearly intended to address harms to property in common ownership and is expressly made available only to those with certain interests in the property on which the waste has been committed. The Bixbys have no remedy for waste committed on an adjoining lot in which they have no possessory interest.

The second possible independent tort cited by the superior court was private nuisance. Suits for private nuisance are governed by AS 09.45.230,[32] which authorizes civil actions "to enjoin or abate a private nuisance" and to recover damages.[33] "Nuisance" is defined by statute as "a substantial and unreasonable interference with the use or enjoyment of real property, including water."[34] We have never had occasion to define "substantial and unreasonable interference" in a published opinion; in an unreported decision, however, we affirmed the superior court's use of the Restatement's multi-factor test in refusing to enjoin the noisy operation of a neighbor's dog kennel.[35] Under the Restatement, "interference is unreasonable if (a) the gravity of the harm outweighs the utility of the actor's conduct, or (b) the harm caused by the conduct is serious and the financial burden of compensating for this and similar harm to others would not make the continuation of the conduct not feasible."[36] The application of these factors "is a problem of relative values to be determined by the trier of fact in each case

---

[32]     *See* AS 09.45.230(e) (stating that with certain exceptions, "a person may not bring a civil action to enjoin or abate a private nuisance or to recover damages for a private nuisance unless the action is authorized by this section").

[33]     AS 09.45.230(a).

[34]     AS 09.45.255.

[35]     *Trails North, Inc. v. Seavey*, Nos. S-8425, S-8505, 1999 WL 33958785 (Alaska Dec. 1, 1999) (citing RESTATEMENT (SECOND) OF TORTS § 826 (AM. LAW INST. 1965)).

[36]     RESTATEMENT (SECOND) OF TORTS § 826.

in the light of all the circumstances of that case";[37] the determination is essentially "a weighing process, involving a comparative evaluation of conflicting interests."[38]

A claim for private nuisance was neither pled in the complaint nor expressly litigated in this case, and accordingly the superior court did not — at least explicitly — conduct the "comparative evaluation of conflicting interests" necessary to find that a private nuisance existed. Whether the interference was "substantial" depended in large part on the extent to which the Bixbys actually intended to "use or enjoy[]" their property; the court made no findings on that topic. As for whether the interference was "unreasonable," the court gauged the unreasonableness of Galipeau's actions solely by reference to the willfulness with which he violated the CCRs — that is, that he committed a willful breach of contract.[39] Setting aside his contractual duties in our search for an independent tort, we see nothing in the court's findings that would support the conclusion that Galipeau's action in cutting down his own trees was an unreasonable use of his own property.

The third possible independent tort cited by the superior court was trespass to trees, codified in AS 09.45.730. The statute addresses the injury or removal of trees, but again only in situations that are expressly enumerated: as most relevant here, they include the unlawful cutting of trees on "the land of another person or on the street or

---

[37]     *Id.* § 826 cmt. b.

[38]     *Id.* § 826 cmt. c.

[39]     In their brief on this appeal, the Bixbys also define Galipeau's conduct as unreasonable for purposes of the private nuisance tort by pointing to "the fact that Galipeau did not own the right to cut down prohibited trees on his lot, even for construction purposes," a restriction which "[h]e voluntarily and knowingly agreed to . . . when he bought his lot." This restriction on Galipeau's rights was solely contractual.

highway in front of a person's house."[40]  Galipeau did not remove trees from "the land of another person"; the cut trees were indisputably on his own property.

The superior court did make a finding that Galipeau "cut down prohibited trees on Fiddlehead Lane . . . , a street in front of the Plaintiffs' house," relying for the finding on Galipeau's deemed admission during discovery.  We are unable to find a further explanation of these trees' location in the trial testimony; the Bixbys themselves did not describe with any particularity the location of the downed trees, and their expert witness described "[m]ost of the trees/stumps" she found on Galipeau's lot as being "clustered together on the central part of the lot, with the exception of . . . the largest stump, that we found at the bottom of the slope," i.e., at the northwest end of the property,[41] far from the southern tip of the property abutting Fiddlehead Lane.  Looking at the small plat of the subdivision admitted as an exhibit at trial, we do not see any place on Galipeau's lot where he could have cut down trees that were situated between the Bixbys' house and the street.  We assume, therefore, that the trees that were cut down were Galipeau's; the court would surely have expressly stated a finding that he cut down trees belonging to the Bixbys, as this would have directly implicated the trespass to trees statute (which the court relied on only by analogy).  We also assume that the trees were not in front  of the Bixbys' house; again, such a finding would have directly implicated the trespass to trees statute.  We are left with this conclusion about the superior court's finding:  although Galipeau cut down trees on his property that were "on Fiddlehead

---

[40]  The other locations of unlawful tree-cutting that could result in liability under the statute include "(2) a village or municipal lot, or cultivated grounds, or the commons or public land of a village or municipality, or (3) the street or highway in front of land described in (2) of this section."  AS 09.45.730.

[41]  Both Evans and Galipeau describe the slope's location as the northwest end of the property.

Lane," a street that is "in front of the Plaintiffs' house," the trees along the street that Galipeau cut down were not in front of the Bixbys' house but rather in front of his own.

This finding did not implicate the damage remedy of AS 09.45.730, as the superior court implicitly concluded by not relying on it. The operative language of the statute involves the liability of one "who without lawful authority cuts down . . . a tree . . . on . . . the street . . . in front of a person's house."[42] We interpret this language as requiring that the unlawfully cut tree was between the person's house and the street, not simply that the tree was on a street that also, at some point in its length, ran in front of the person's house. The latter interpretation would lead to absurd results, as persons who lived blocks away would have a right of action simply because they lived on the same street as the downed tree. In short, there is no reasonable interpretation of the trespass to trees statute, AS 09.45.730, that would apply to the actions at issue here.

We conclude, therefore, that Galipeau's breach of the CCRs, though willful, did not constitute an independent tort for which he could be liable for punitive damages. Because punitive damages may not be awarded in breach of contract actions absent conduct amounting to an independent tort, we must vacate the punitive damages award.

### 2. Alaska Statute 34.08.670, which concerns common interest ownership, does not apply.

In its conclusions of law, the superior court cited AS 34.08.670 to bolster its contention that punitive damages were available, and the Bixbys rely on the statute on appeal. The statute provides, in pertinent part, that persons who are adversely affected by a failure to comply with Title 34, chapter 8 — governing "common interest communities"[43] — have "a claim for appropriate relief," which includes punitive

---

[42]    AS 09.45.730.

[43]    *See* AS 34.08.010 ("Except as provided in AS 34.08.030, this chapter
(continued...)

damages "for a wilful failure to comply with this chapter."[44] The Bixbys argue that their subdivision is a "common interest community" covered by the chapter.

But "common interest community" is a precisely defined term for purposes of Title 34, chapter 8. A "common interest community" is "real estate with respect to which a person, by virtue of ownership of a unit, is obligated to pay for real estate taxes, insurance premiums, maintenance, or improvement of other real estate described in a declaration."[45] The Bixbys appear to argue that they are members of a "planned community" and therefore in a "common interest community," but to be covered by Title 34, chapter 8 a planned community must still meet the "common interest community" definition.[46] And as Galipeau points out, nothing in the CCRs satisfies the definitional requirement that the residents of the subdivision be "obligated to pay for real estate taxes, insurance premiums, maintenance, or improvement of other real estate" in the subdivision; they are more appropriately characterized as residents of a "general plan development."[47] As the Bixbys are not members of a "common interest community," AS 34.08.670 does not give them a basis for a punitive damages award.

---

[43] (...continued) applies to each common interest community created within the state after January 1, 1986.").

[44] AS 34.08.670.

[45] AS 34.08.990(7).

[46] *See* AS 34.08.990(24) (defining "planned community" as "a common interest community that is not a condominium or a cooperative").

[47] *See* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 1.7(1) (AM. LAW. INST. 2000) ("A 'general-plan development' is a real-estate development or neighborhood in which individually owned lots or units are burdened by a servitude imposed to effectuate a plan of land-use controls for the benefit of the property owners in the development or neighborhood.").

## V.    CONCLUSION

We VACATE the superior court's judgment and its awards of compensatory damages and punitive damages.  We REMAND with instructions for the superior court to enter an award of nominal damages and to revisit the issues of prejudgment interest and attorney's fees as may be necessary.