NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| FIRST EVANGELICAL COVENANT CHURCH OF ANCHORAGE ALASKA, ) ) | Supreme Court No. S-18748 |
| Appellant, | Superior Court No. 3AN-17-05613 CI |
| v. | MEMORANDUM OPINION AND JUDGMENT* |
| MICHAEL L. FOSTER & ASSOCIATES, INC., | No. 2126 – January 14, 2026 |
| Appellee. | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Kevin T. Fitzgerald, Ingaldson Fitzgerald, P.C., Anchorage, for Appellant. Charles Cacciola, Munson, Cacciola & Severin, LLP, Anchorage, for Appellee.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

I.     INTRODUCTION

After a church was damaged in a fire, the church's leadership began negotiations with a general contracting firm for repairs. The parties then executed a

_____

\*      Entered under Alaska Appellate Rule 214.

contract. As the repair work progressed, the church's insurer raised objections to the firm's invoices. Eventually, the insurer stopped making payments. The firm completed almost all of the repair work; it then filed suit against the church alleging breach of contract for unpaid invoices. The church filed a number of counterclaims against the firm, including for breach of contract. After a bench trial, the superior court found that the firm had met its burden to prove that most of its rates were reasonable. The court also dismissed the church's counterclaims and awarded damages to the firm.

Apart from requiring a relatively small reduction to the damages award, we affirm the superior court's rulings.

## II. FACTS AND PROCEEDINGS

### A. Facts

In December 2015 a fire damaged the First Evangelical Covenant Church of Anchorage. Afterward, First Covenant contacted its insurer, Church Mutual Insurance Co., which sent an adjuster to the site. First Covenant leadership also met with Michael Foster of Michael L. Foster & Associates (MFA), a general contracting firm. After a site tour and some discussion, the church's leadership asked Foster to draw up a contract for MFA to make repairs.

The contract drawn up by Foster included a fee schedule for the hourly rates that MFA would charge for its employees' labor. The contract also stated that MFA would "work directly with the Church's insurance carrier and adjuster." Prior to entering the contract, Foster made an oral promise to First Covenant leadership, which the superior court later described as a promise that MFA would "not cause[] the church to incur any expenses not covered by" the insurer.

Starting in February 2016, Church Mutual began to push back on what it viewed as "excessive" engineering fees in MFA's invoices, and it made several requests for backup documentation to support the charges while delaying full reimbursement. Later that year, Foster approached church officials about the

possibility of the church assigning its rights under the insurance contract to MFA so that MFA could, if necessary, sue Church Mutual directly.

Despite Church Mutual's objections to MFA's invoices, the insurer continued to send First Covenant checks earmarked for certain expenses; the church then forwarded the checks to MFA, and the firm applied them to the latest outstanding invoice. But in January 2017, Church Mutual informed First Covenant that it would not cover a significant portion of MFA's fees. The insurer asserted that MFA's labor rates for several employees, including non-engineer laborers, were unjustified. MFA stopped work on the project in February 2017 "[b]ased on the on-going issues with payment from Church Mutual."

## B.     Proceedings

In March 2017 MFA filed a lawsuit for breach of contract against First Covenant in superior court.[1] MFA sought $147,592.39 in damages for work it had completed and expenses it had incurred on the project.[2]

One month later, Church Mutual and First Covenant entered an agreement in which Church Mutual agreed to "defend and indemnify the church" in the lawsuit. The agreement provided that Church Mutual's attorney would represent First Covenant. In its amended answer to MFA's complaint, First Covenant raised six counterclaims for damages.[3]

The superior court held an eight-day bench trial in June 2022. The parties agreed that to succeed on its damages claim, MFA would need to prove that

---

[1]     By that time, two items on the project checklist remained incomplete — painting the church sanctuary and repairing the railing for the basement staircase.

[2]     MFA also sought to foreclose a mechanic's lien of $120,766.75 that it held on the church to partially satisfy the judgment.

[3]     The counterclaims were (1) breach of contract, (2) breach of the duty of good faith and fair dealing, (3) misrepresentation, (4) fraudulent lien, (5) fiduciary fraud, and (6) unfair trade practices.

its billings were for costs that were "reasonable and necessary" to restore the church to its pre-loss condition.

In January 2023 the superior court issued an order finding that First Covenant had breached its contract with MFA, awarding MFA $129,326.39 in damages, and dismissing First Covenant's counterclaims. MFA then moved for prejudgment interest and attorney's fees, which the superior court granted.

First Covenant appeals.

## III. STANDARD OF REVIEW

"We review the interpretation of a contract de novo."[4] But "interpretation becomes a task for the trier of fact when the parties present extrinsic evidence to clarify a contract's meaning, when this evidence points toward conflicting interpretations of the contract, and when the contract itself is reasonably susceptible of either meaning."[5] Thus, where the trial court's conclusions regarding the parties' reasonable expectations and intentions are based on extrinsic testimonial evidence, we apply the clearly erroneous standard to its factual determinations.[6]

## IV. DISCUSSION

First Covenant argues that the superior court erred by finding that MFA proved that its labor charges were reasonable and necessary, and by awarding MFA damages for various other expenses, including payments made to subcontractors and administrative costs. The church also faults the court for dismissing its counterclaims, and it challenges the court's award of attorney's fees and prejudgment interest to MFA.

---

[4] *Nautilus Marine Enters., Inc. v. Exxon Mobil Corp.*, 305 P.3d 309, 315 (Alaska 2013) (quoting *Villars v. Villars*, 277 P.3d 763, 768 (Alaska 2012)).

[5] *Little Susitna Constr. Co. v. Soil Processing, Inc.*, 944 P.2d 20, 23 (Alaska 1997).

[6] *See Krossa v. All Alaskan Seafoods, Inc.*, 37 P.3d 411, 415 (Alaska 2001).

We conclude that the superior court's damages award, save for one relatively small error, was not clearly erroneous. Further, the court's findings related to First Covenant's counterclaims are supported by the record, and it was not error to dismiss them. Finally, we hold that the church has waived its objections to the superior court's award of attorney's fees and determination of prejudgment interest.

## A. The Damages Award Was Not Clearly Erroneous, Save For One Miscalculation.

First Covenant asserts that the evidence it offered at trial established that MFA's billing rates for certain employees, inclusion of certain "administrative duties" in billings, and other charges were unreasonable. The church also faults the court for failing to properly calculate an offset: the difference between reasonable rates and the actual rates that MFA billed for its employees. The church further complains the court mistakenly declined to offset MFA's damages award against subcontractor payments the church claims that it had already paid.

We conclude that, except for one miscalculation,[7] the superior court did not clearly err by finding that MFA had proven that its damages for labor, subcontractor payments, and other expenses were both reasonable and necessary to First Covenant's restoration. Accordingly, we vacate and remand the award for that correction, but we otherwise affirm the superior court's award.

### 1. Except for one charge, the superior court did not clearly err by finding that MFA's labor rates were reasonable.

First Covenant's primary complaint is that MFA based its hourly labor rate on each employee's position rather than on the type of work the employee was actually performing. Specifically, the church argues that although it approves of Foster's $195 rate for engineering work, Foster performed other work that was better

---

[7] As explained below, it was clear error to fail to account for the number of hours that one employee was billed at a rate that was higher than the reasonable rate.

categorized as "project management." According to First Covenant, it established at trial that $71.31 is a reasonable hourly rate for project management. Similarly, First Covenant asserts that MFA superintendent Robert Ross, who billed at $105, was better characterized as a lead carpenter, a position the church believes should be billed at $77.45.

Contrary to First Covenant's arguments, the record supports the superior court's finding that MFA proved, by a preponderance of the evidence, that its labor billing rates were reasonable.[8] Foster testified that MFA had charged "identical" rates on a project for another church which was also insured by Church Mutual, and that the insurer never objected to MFA's rates, invoices, or documentation on that project. This testimony, establishing that Church Mutual had approved of MFA's rates in the past, was itself legally sufficient to support the superior court's damages award.[9] And although MFA was not required to submit documentary evidence to substantiate its damages claim,[10] it provided more than 1000 pages of records, including timesheets, internal jobsite reports, and telephone records, to support its labor charges.

First Covenant counters that it presented sufficient evidence to establish that MFA's rates were not reasonable for the work its employees performed. That evidence, the church says, is "largely contained in" three letters, written by its own

---

[8]     *See Fletcher v. Trademark Constr., Inc.*, 80 P.3d 725, 731 (Alaska 2003) (holding that contract damages must be established by preponderance of evidence).

[9]     *See Griffith v. Hemphill*, 521 P.3d 584, 590-91 (Alaska 2022) ("[T]he testimony of a single witness is enough to give the fact-finder a 'reasonable basis upon which to calculate the amount of damages . . . [o]nce actual damages are shown and there is a reasonable basis for computing an award.' " (second alteration in original) (quoting *Conam Alaska v. Bell Lavalin, Inc.*, 842 P.2d 148, 154 n.10 (Alaska 1992))).

[10]     *Id.* at 590.

attorney,[11] which form the primary factual basis for several of the church's claims.[12] But First Covenant's reliance on these letters is misplaced. After MFA objected to the letters on hearsay grounds, the court admitted them only for the limited purpose of showing Church Mutual's position regarding MFA's labor rates. Thus, First Covenant may not rely on naked factual assertions in its own attorney's letters "to prove the truth of the matter[s] asserted" therein.[13]

First Covenant also relies heavily on testimony from Church Mutual's adjuster, who opined that MFA's labor rates were "excessive." But the superior court found the adjuster's use of a software program to calculate appropriate labor rates to be unpersuasive, noting that Alaskan wages are often higher than those in other states, and that First Covenant "provided no detail of" how the program generated its rates. The court's determination was not clearly erroneous. The adjuster's proffered rates were based on his personal characterization of each employee's work, rather than the employee's title. But those characterizations were largely conclusory and lacked detailed justification.[14] Giving "due regard to the trial court's opportunity to evaluate

---

[11]     The attorney was representing Church Mutual at the time the letters were written.

[12]     These claims include the following: (1) that employee Ross was a "lead carpenter" rather than a superintendent; (2) that Foster was a "project manage[r]" rather than an engineer or principal; and (3) that, contrary to Foster's testimony about MFA's past projects involving Church Mutual, there were "significant issues" with MFA's billing on those projects.

[13]     *Dobos v. Ingersoll*, 9 P.3d 1020, 1024 (Alaska 2000); Alaska R. Evid. 801(c); Alaska R. Evid. 802.

[14]     For example, when asked how the adjuster and First Covenant's attorney reached the conclusion that Ross was a "lead carpenter" rather than superintendent, the adjuster responded, "The tasks he performed. I mean, he was the lead carpenter."

the credibility of witnesses,"[15] we conclude that the superior court did not err by finding that MFA proved its labor rates were reasonable.

## 2. The calculation of the amount due for one employee's services was clear error.

The superior court concluded that $85 was a reasonable hourly rate for MFA employee Benjamin Gerwig's work, but the court nonetheless awarded MFA $105 for some of Gerwig's hours. This was clearly erroneous.

Starting in November 2016, Foster reduced Gerwig's hourly rate from $105 to $85 for on-site work as a concession to Church Mutual,[16] but Foster continued billing Gerwig's off-site hours at $105. The superior court, citing Foster's concession, found that $85 was a more reasonable hourly rate for Gerwig's work.[17] Accordingly, the court calculated the total number of hours for which Gerwig had been billed at $105, multiplied that number by $20 to reflect the difference in the two rates, and then reduced MFA's damages award by that amount, which totaled $20,714.

However, the superior court undercounted the number of hours for which Gerwig had been billed at $105. The court assumed that after November 27, 2016, MFA had billed all of Gerwig's hours at $85; as a result, the court ignored the later invoices. But First Covenant notes, and MFA concedes, that those later invoices included 190.4 hours of off-site time which were billed at $105. The superior court should have awarded MFA an hourly rate of $85, rather than $105, for those hours.[18]

---

[15] *Curran v. Hastreiter*, 579 P.2d 524, 527 (Alaska 1978).

[16] MFA had billed Gerwig as a project-level engineer early in the project despite his not yet having a license. Foster explained that Gerwig was an "exceptional engineer" and "technically as good as any other" project level employee at MFA. Gerwig obtained his licensure prior to trial.

[17] The court also cited descriptions of Gerwig's work, including physical labor and "coordinating the efforts of various workers," as "evidence that the lower rate reflected a more accurate description of . . . the work that he was performing."

[18] 190.4 hours x $20/hour = $3,808.

Thus, the superior court should have reduced MFA's damages award by an additional $3,808.[19]

Accordingly, on remand the superior court must reduce MFA's damages award from $129,326.39 to $125,518.39.

> **3.** **The superior court did not err by awarding MFA damages for administrative labor and expenses, subcontractor payments, and subcontractor handling fees.**

First Covenant argues that MFA should not be reimbursed for hours its employees spent responding to Church Mutual's requests for information or for administrative expenses. It asserts that those charges should be included in MFA's flat rate for overhead and profit, charges which the church claims that it paid. Additionally, First Covenant claims that the superior court erroneously included payments to subcontractors in MFA's award when the church, rather than MFA, paid those subcontractors. Finally, First Covenant argues that MFA improperly charged a handling fee for those subcontractors.

MFA responds, in part, that First Covenant's arguments related to overhead and profit were waived in the superior court. We disagree. First Covenant clearly argued in closing that any administrative costs should be "noncompensable." But we agree with the superior court that First Covenant's arguments on the merits are not persuasive.

The superior court did not clearly err by awarding MFA damages for time spent responding to Church Mutual's requests for information. As the court correctly noted, First Covenant explicitly bargained for, and received, a contract term

---

[19] MFA suggests that the superior court may have intended to offset only Gerwig's on-site hours, rather than all of his hours. But this would be inconsistent with the court's initial reduction. Gerwig testified at trial that he billed at $105 for off-site work prior to Invoice 11. The court was thus aware that it was reducing the billing rate for Gerwig's off-site work when it applied a blanket reduction to all of those invoices.

providing that MFA would "work directly with the Church's insurance carrier and adjuster." A church official confirmed that the term was "important . . . in the formation of the contract." Further, the contract itself provided an hourly rate of $85 for "administrative" work, which is the rate the church ultimately paid for the time Gerwig spent responding to the insurer's inquiries.

Similarly, it was not clearly erroneous to award MFA damages for administrative expenses such as copies. The contract provided for independent billing of certain costs, including equipment fees. Gerwig testified that MFA's equipment list includes copy and fax machines; that when equipment is used, the employee will bill that usage to each project; and that this approach is used for all projects. First Covenant disagrees, contending that copy costs should not have been billed independently from overhead and profit. Based on this record, the superior court properly relied on the contract and rejected First Covenant's argument.

First Covenant's arguments that MFA improperly included charges for work by two subcontractors in its damages claim similarly fail. First Covenant claims that its insurer "prepaid" $28,573.14 for a subcontractor, Florcraft Carpet One, and that the superior court erroneously awarded MFA damages for that cost. MFA responds that "MFA, not [the insurer], paid Florcraft." MFA is correct. The record clearly shows that MFA, not First Covenant or Church Mutual, paid Florcraft.[20] Likewise, First Covenant argues that work completed by Franklin & Associates, a subcontractor engineering firm, "was paid by Church Mutual." But again, the record clearly shows that MFA, not Church Mutual, paid Franklin's invoices.

---

[20] First Covenant alleges that when the complaint was filed, MFA sought damages for the Florcraft work even though it had not yet paid Florcraft. The superior court properly found this fact irrelevant. MFA hired Florcraft and was thus liable for the bill, and MFA did not revise its damages request after it paid the bill in July 2018.

In simple terms, First Covenant argues that because its insurer earmarked certain payments for certain expenses, those expenses should be treated as paid. But as Foster testified, once First Covenant received payments from its insurer and passed them to MFA, MFA applied them to its oldest unpaid invoice. This practice was consistent with the contract, which provided that payments would "be applied first to any accrued service charge and then to the principal unpaid amount." Removing those payments from MFA's damages award would mean that whatever costs MFA *did* apply them to — whether labor, materials, or other expenses — would then go unpaid. The superior court properly declined to adopt First Covenant's position.

Finally, we see no error in the superior court's conclusion that the 15% fee charged by MFA for managing subcontractor Taylored Restoration was a reasonable one.[21] While Taylored Restoration did the work, MFA added a 15% fee to the cost of Taylored Restoration's work. The church characterizes this practice as MFA charging as if it had done the work, and contends that this practice, if not fraudulent, violates the Unfair Trade Practices Act (UTPA) or was in bad faith. Based on the record, we disagree.

First, as MFA correctly notes, it was First Covenant, not Church Mutual, that retained Taylored Restoration. Second, the record shows that MFA, at the church's request, managed Taylored Restoration on site. As Gerwig confirmed, MFA "had site control," and the church "asked that [MFA] manage" Taylored Restoration "the day [MFA] was brought on the project," which MFA did. And third, the contract provided that MFA would bill First Covenant "[c]ost plus 15 percent for subcontracted expenses." MFA's 15% handling fee for Taylored Restoration was thus

---

[21] First Covenant leadership had retained Taylored Restoration, an emergency flood and fire remediation business, to make some immediate repairs after the fire.

not only in line with the contract — it reflected MFA's managerial duties, which MFA assumed at the church's request.

It is immaterial that MFA did not directly subcontract with Taylored Restoration. Given MFA's responsibility for managing the project, Taylored Restoration's presence on site posed the same risks, challenges, and expenses as any other subcontractor. Further, First Covenant assumed that MFA would pay Taylored Restoration directly as if it *were* MFA's subcontractor, which MFA did. Thus, MFA should be compensated in accordance with the contract's express terms.

In sum, the superior court did not clearly err by finding that MFA proved that its labor rates were reasonable or by awarding MFA damages for administrative labor and expenses, payments made to subcontractors, or subcontractor handling fees.[22]

### B. The Superior Court Did Not Err By Dismissing First Covenant's Counterclaims.

First Covenant argues that the superior court erred by dismissing its counterclaims for breach of contract and breach of the duty of good faith and fair dealing. First Covenant asserts that MFA breached two terms of the contract: an oral promise by Foster that MFA would not "seek money from the church beyond what [Church Mutual] paid," and MFA's obligation to "return [First Covenant] to its pre-loss condition." First Covenant also argues that MFA breached the duty of good faith and fair dealing. We conclude that the superior court did not err by dismissing First Covenant's counterclaims.

---

[22] For the same reasons, we also reject First Covenant's arguments that MFA's billing practices related to administrative work and subcontractors constituted a breach of the duty of good faith and fair dealing, misrepresentation, fiduciary fraud, or violated the UTPA. The superior court properly dismissed these counterclaims.

### 1. The superior court did not clearly err by finding that MFA did not breach Foster's oral promise to First Covenant.

The superior court found that, at the time of contract formation, Foster made an oral promise to First Covenant regarding the church's liability for expenses beyond those covered by its insurer.[23] The superior court generally described it as either a "promise not to collect unpaid billings from" First Covenant or a promise that MFA would "not cause[] the Church to incur any expenses not covered by" its insurer. Further, the court distinguished Foster's promise from a promise "not to sue the church." The court concluded that because First Covenant and Church Mutual executed an indemnification agreement that made the insurer liable for all of the damages that MFA sought, MFA had not breached Foster's oral promise.

First Covenant argues that the superior court's differentiation between Foster's promise and a promise not to sue "is a distinction without any difference." According to the church, Foster promised not to seek any money from First Covenant beyond what Church Mutual paid and MFA breached that promise when it filed a lawsuit against the church for damages. First Covenant claims that it suffered damages equal to the amount MFA was awarded at trial.[24]

We are not persuaded by First Covenant's arguments. Although the court offered competing descriptions of Foster's promise, it took pains to distinguish between a promise "not [to] seek to recover unpaid billings from" First Covenant and a promise "not to sue." In other words, the court found that MFA's lawsuit was not an attempt to collect unpaid billings from First Covenant. Rather, as the superior court

---

[23] Foster asserted that his oral promise was conditioned on First Covenant assigning its insurance contract rights against Church Mutual to MFA. But the superior court, noting no corroborating testimony from church officials, found that Foster's promise was not conditioned on such an assignment.

[24] First Covenant concedes that "absent an award in favor of [MFA,] the church's damages for breach of contract [are] limited."

explained, the lawsuit was an attempt to secure payment from First Covenant's insurer. MFA did not serve First Covenant with the complaint until after the church declined to assign its rights against Church Mutual to MFA. And although First Covenant did not assign its rights to MFA after the suit was filed, it entered an indemnity agreement with Church Mutual. The result was that MFA did "not cause[] the Church to incur any expenses not covered by" its insurer, which was "exactly what Foster and MFA promised."

The superior court's interpretation is amply supported by the record.[25] Foster testified that MFA's attorney had tried to negotiate an assignment with First Covenant, but those efforts failed. Further, a church official testified to his belief that Foster "thought he needed to sue the Church in order to get the Church to assign their rights to him in order to get money from the insurance company." And when asked whether he believed Foster had breached his promise by suing First Covenant, the official responded, "That's a harder question to answer than just a simple yes or no."

The superior court did make one factual error; it found that the church and its insurer entered the indemnity agreement *before* MFA filed suit. This was clearly erroneous — MFA's complaint was filed before the indemnity agreement was executed. But we disagree with First Covenant that this factual error affected the court's interpretation of Foster's promise and ruling on breach. The timing of the agreement does not alter the fact that First Covenant was unresponsive to MFA's request for an assignment of rights and that, by virtue of the subsequent indemnity agreement between the church and its insurer, MFA did not cause the church to incur

---

[25]   *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004) (noting that contract interpretation "becomes a task for the trier of fact when the parties present extrinsic evidence to clarify a contract's meaning").

any costs beyond what the insurer paid.[26] And First Covenant cites no evidence that MFA's filing of the complaint caused the church to incur any expenses that were not covered by the agreement. Accordingly, the error was harmless.

Further, we decline to accept First Covenant's damages theory, which is predicated on the superior court's judgment against it. Church Mutual, not First Covenant, is liable for the judgment per their indemnity agreement. Accordingly, First Covenant has not "actually sustained" any loss.[27]

In sum, the superior court's interpretation of Foster's oral promise — that First Covenant would not incur any expenses beyond what Church Mutual paid — is supported by testimony and evidence in the record.[28] And the court's finding that MFA did not breach that promise was not clearly erroneous.

**2. The superior court did not clearly err when it found MFA did not breach its obligation to restore the church to its pre-loss condition.**

First Covenant argues that MFA breached its contractual obligation to return the church to its pre-loss condition because it failed to fully complete the restoration project. First Covenant references $11,565 in work — including painting the church sanctuary and replacing the rear entry staircase railing — that "still had not

---

[26] Our decision here is limited to reviewing the superior court's interpretation of the promise at issue. We do not intend to suggest that an insurer's decision to indemnify an insured defines the coverage provided under a policy.

[27] *Galipeau v. Bixby*, 476 P.3d 1129, 1134 (Alaska 2020) (holding that damages "may not be awarded for 'mere breach' " and instead "must correspond to. . . the loss or damage actually sustained" (quoting 24 WILLISTON ON CONTRACTS § 64:12 (4th ed. 2020))).

[28] *Mun. of Anchorage v. Gentile*, 922 P.2d 248, 256 (Alaska 1996) (noting that when trial court "relies on conflicting extrinsic evidence" to interpret contract, we are "confined to determining whether the facts support the trial court's interpretation" (quoting *Fairbanks N. Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1025 (Alaska 1986))).

been performed" when MFA filed its complaint. First Covenant claims, without supporting evidence, that it "otherwise had to pay to have this same work done." MFA responds that it was entitled to suspend work because of First Covenant's nonpayment. We agree with MFA.

Where one party to a contract materially fails to perform, "[i]t prevents performance of [the other party's remaining] duties from becoming due, at least temporarily, and it discharges those duties if it has not been cured during the time in which performance can occur."[29]

The parties' contract provided that MFA's invoices were "payable upon receipt." But by December 2016, $134,000 in unpaid invoices had accumulated for work that had already been completed by MFA. Foster testified that "by late fall [of 2016], . . . it was clear to me that the carrier, Church Mutual, was not going to pay First Covenant for the repairs and services . . . that we had or were providing." Under these circumstances, MFA was not required to continue providing services to First Covenant. The church's failure to pay its invoices excused MFA's obligation to continue working on the project.[30]

The superior court's finding that MFA did not breach its promise to return First Covenant to its pre-loss condition is not clearly erroneous.

### 3. The superior court did not clearly err when it found MFA did not breach the duty of good faith and fair dealing.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."[31] The duty of good faith has both a subjective and objective component; a party "cannot act to deprive the other party of

---

[29] RESTATEMENT (SECOND) OF CONTS. § 237 cmt. a (A.L.I. 1981).

[30] *See Com. Recycling Ctr., Ltd. v. Hobbs Indus., Inc.*, 228 P.3d 93, 99 (Alaska 2010) ("One party's failure to perform under a contract gives an injured party who has not already performed a right of non-performance . . . .").

[31] RESTATEMENT (SECOND) OF CONTS. § 205 (A. L. I. 1981)

the explicit benefits of the contract" and must act "in a manner that a reasonable person would regard as fair."[32] Although we have recognized that a party may breach the duty through inaction, "a party's action or inaction should be viewed through a lens of reasonableness."[33]

First Covenant argues that MFA breached the duty of good faith and fair dealing by dragging its feet when Church Mutual requested additional documentation for some of MFA's invoices.[34] The church argues that Foster "admitted" that he acted in bad faith. Specifically, in a deposition, First Covenant's attorney asked Foster whether he believed his failure to timely provide the documentation was in good faith, to which Foster replied: "No."

At trial the superior court rejected First Covenant's argument that Foster's statement was proof of bad faith, noting that "if no additional information had been provided, that would be one thing, but additional information was provided."[35] Foster was "not bound by the fact that he made a comment" that he acted in bad faith, the court explained, because "his subsequent behavior has to be evaluated." The court implicitly concluded that despite Foster's delay, he ultimately

---

[32]    *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 384 (Alaska 2004).

[33]    *Kimp v. Fire Lake Plaza II, LLC*, 484 P.3d 80, 92 (Alaska 2021).

[34]    First Covenant also argues that MFA acted in bad faith by billing the church for its legal fees. However, the legal billings were consistent with the parties' contract, and MFA subsequently removed the legal fees from its invoices. The superior court properly rejected this argument.

[35]    The superior court did not expressly address First Covenant's bad faith argument in its written order, but "we assume it was implicitly rejected" by the court's summary dismissal of the church's counterclaims. *Laybourn v. City of Wasilla*, 362 P.3d 447, 458 (Alaska 2015).

responded within a reasonable amount of time.[36] We cannot say that this conclusion leaves us with "a definite and firm conviction that a mistake has been made."[37]

Foster testified that Church Mutuals' demands were unclear and, at times, contradictory. He acknowledged that Church Mutual requested "a complete breakdown of" MFA's engineering fees in February 2016, but he said the insurer's adjuster informed him during a subsequent site visit that Church Mutual was "not paying any engineering fees" to MFA. Accordingly, Foster "didn't see any purpose to providing anything else for engineering fees." Foster also said Church Mutual never identified a specific invoice or billing item for which it wanted additional documentation, a point he raised with the insurer in October.

Despite the requests' lack of clarity, Foster and Gerwig went forward with compiling documentation for all of MFA's labor charges.[38] Gerwig said he sifted through his own notes, timesheet documentation, photo logs, and other project record files, and then compiled the information into labor descriptions. Gerwig drafted descriptions for the first six months in May 2016, but Foster said the document "slipped through the cracks, [or] it got lost." Gerwig ultimately provided Church Mutual with the first installment of those narrative descriptions in October and the second in November.

First Covenant leans heavily on Foster's "admission" that his delay in providing Church Mutual with the requested documentation was not in good faith, but the church's reliance is misplaced. Whether Foster's conduct was, in fact, a breach

---

[36] *See Kimp*, 484 P.3d at 92 (finding no breach where party responded "in a reasonable amount of time").

[37] *Alaska Far E. Corp. v. Newby*, 630 P.2d 533, 533 (Alaska 1981).

[38] MFA's "standard practice of invoicing for all of [its] clients" was to include with each invoice a spreadsheet showing its employees' hours worked, which were itemized by position, and receipts for any additional "rebillables" such as subcontractor fees.

of the duty of good faith was a question for the superior court.[39]  First Covenant points to no evidence that Foster was even aware of the duty of good faith, much less that he was familiar enough with the legal doctrine to apply it to his own conduct.  It was thus appropriate for the superior court to give Foster's statement relatively little weight.[40]

Viewing the evidence in the light most favorable to MFA,[41] we conclude that the superior court did not clearly err by finding that MFA did not breach the implied duty of good faith and fair dealing.

### C.    First Covenant Waived Its Right To Challenge The Superior Court's Award Of Prejudgment Interest And Attorney's Fees.

On motion from MFA, the superior court set a prejudgment interest rate of 18% per annum with an accrual date of March 23, 2017.  The court awarded MFA $129,326.39 in prejudgment interest.  The court also awarded MFA $98,872 in attorney's fees.

First Covenant suggests that it never consented to the interest rate or fee award provisions included in the parties' contract, and it asserts that the maximum allowable prejudgment interest rate under AS 45.45.010(b) is 10%.[42]  First Covenant has waived these arguments.

---

[39]    *Becker v. Fred Meyer Stores, Inc.*, 335 P.3d 1110, 1116 (Alaska 2014) ("[G]enerally whether the covenant has been breached is a question for the trier of fact." (alteration in original) (quoting *Mills v. Hankla*, 297 P.3d 158, 167 (Alaska 2013))).

[40]    *Curran v. Hastreiter*, 579 P.2d 524, 527 (Alaska 1978) (noting that we "must give due regard to the trial court's opportunity to evaluate the credibility of witnesses").

[41]    *Id.* ("In carrying out our appellate review functions, we are required to take the view of the evidence most favorable to the prevailing party at trial.").

[42]    The church also argues that the amount and rate of prejudgment interest awarded to MFA is usurious, constitutes a double recovery, violates the principles underlying prejudgment interest, and violates public policy.

First Covenant did not oppose MFA's motions for prejudgment interest and attorney's fees or seek reconsideration of the superior court's orders granting those motions. Accordingly, First Covenant has waived its challenge to the court's entry of prejudgment interest and fee award.[43] Further, the 18% interest rate awarded by the superior court is not precluded by AS 45.45.010(b), as that statute exempts from its limitation "[a] contract or loan commitment in which the principal amount exceeds $25,000."[44]

## V. CONCLUSION

The judgment of the superior court is AFFIRMED in part, VACATED in part, and REMANDED for further proceedings consistent with this opinion.

---

[43] *See Taylor v. Wells Fargo Home Mortg.*, 301 P.3d 182, 193 (Alaska 2013) (holding that appellant "waived her right to object to the calculation of prejudgment interest on appeal" because she "failed to object to [appellee's] proposed entry of prejudgment interest"); *Johnson v. State*, 380 P.3d 653, 658 (Alaska 2016) (holding that appellant "clearly waived" challenge to fee award by failing to oppose fee motion or seek reconsideration of fee award).

[44] We review the interpretation of statutes de novo. *Beaux v. Jacob*, 30 P.3d 90, 100 (Alaska 2001).